[Cite as *State v. Powell,* 132 Ohio St.3d 233, 2012-Ohio-2577.]

THE STATE OF OHIO, APPELLEE, *v.* POWELL, APPELLANT.

[Cite as *State v. Powell,* 132 Ohio St.3d 233, 2012-Ohio-2577.]

*Criminal law—Aggravated murder—Death penalty affirmed.*

(No. 2007-2027—Submitted March 20, 2012—Decided June 13, 2012.)

APPEAL from the Court of Common Pleas of Lucas County,

No. G4801-CR-0200603581-000.

_____

PFEIFER, J.

{¶ 1} This is an appeal as of right by defendant-appellant, Wayne Powell. A jury convicted Powell of the aggravated murder of Rosemary and Mary McCollum, four-year-old Jamal McCollum-Myers, and three-year-old Sanaa' Thomas, and of aggravated arson. The jury recommended the sentence of death for the aggravated murder of the four victims. The trial court accepted those recommendations and sentenced Powell accordingly.

{¶ 2} For the following reasons, we affirm Powell's convictions and sentences of death.

*State's case*

{¶ 3} Mary McCollum lived in a two-story house at 814 St. John Avenue in Toledo. Rosemary, Mary's mother; Jamal, Mary's adopted son; and Ebony Smith, Mary's cousin, also lived at the house. Rosemary spent much of the time in bed because of health problems and was unable to walk without assistance.

{¶ 4} Powell and Mary McCollum had a personal relationship for more than ten years and had lived together "off and on" at her home for "about a year, year and [a] half." Powell moved out of the house before October 2006, though the exact date is unclear.

{¶ 5} Powell continued to see Mary after he moved out. He later told investigators that he would sneak into the house and sometimes spend the night. Mary would hide him in the closet, by the side of the bed, or in the basement so that her family would not know that he was there. Powell claimed they had disagreements because Mary did not want her family to know that he was still coming to the house.

{¶ 6} At 6:45 p.m. on September 23, 2006, Powell called Mary and threatened to burn her house down. In a voice mail left on Mary's phone, Powell stated, "I'm coming to burn the house because you don't play with me. Better get your mom out, the bitch and your kids * * * because I'm coming." Five minutes later, Powell called Mary and left another voice mail. He stated, "I'm almost there. Telling you. I'm also going to [unintelligible] gas."

{¶ 7} On the evening of October 19, 2006, Mary and Ebony smelled gasoline on the front porch of the house. They called 9-1-1, and firemen arrived and hosed down the porch. Captain Joseph Wlodarz, a Toledo fireman, testified, "You could actually see [the gasoline] being absorbed into the porch and into the wall * * *." Wlodarz estimated that "at least a couple gallons" of gasoline had been poured on the porch.

{¶ 8} On the morning of October 20, Annette McCollum, Mary's sister, confronted Powell and asked him why he had poured gasoline on the front porch. Powell said he did it because Mary was not paying him any attention. Powell said that he "wasn't going to set the house on fire"; he just wanted to "scare her." No one told the police that Powell had poured gasoline on the porch, because Mary was afraid of losing custody of Jamal again if she reported Powell.

{¶ 9} Mary's friends and relatives often visited and spent the night at her house. On the evening of November 10, 2006, Mary, Rosemary, four-year-old Jamal, and five other people slept at Mary's house: Lynnita Stuart, two-year-old

Sanaa' Thomas, ten-year-old Antonio Boone, 11-year-old Dashawn Davis, and five-year-old Danshi Mitchell. Rosemary and Sanaa' slept in the back upstairs bedroom, Mary and Jamal slept in the front upstairs bedroom, and Lynnita and her son, Dashawn, slept in the middle upstairs bedroom. Antonio and Danshi slept downstairs on the living-room couch.

{¶ 10} Markisha Campbell, the defendant's daughter, and Makyca Finch, his granddaughter, often stayed at Mary's house. The night before the fire, Powell called Markisha and asked how she and Makyca were doing and where they were. Markisha told Powell that she was at home and that Makyca was with Markisha's sister.

{¶ 11} Between 12:30 a.m. and 1:00 a.m. on November 11, Charles Powell, a younger brother of Powell, drove Powell to Mary's house. Powell pounded on the front door, and Lynnita answered it. Powell said he wanted his boots and a pair of boxer shorts that he had left at the house. Mary got these items, and Lynnita handed them to him. Powell accused Lynnita of standing between him and Mary and started calling Lynnita "dike Bs, grabbed the door, [and] told Mary she * * * gonna F around and make him kill her." Mary told Powell, "I don't want no trouble between you and my cousin. Can you please leave." Powell asked Mary for a kiss, and she refused. Powell and his brother then drove away.

{¶ 12} After leaving the house, Powell called Mary, and Lynnita overheard some of the conversation. Powell accused Mary of having "the dike bitch listening to [his] phone call" and warned, "You going to make me fuck you up."

{¶ 13} Later that evening, Lynnita was awakened by screams from Rosemary's room. Lynnita felt heat, saw smoke, and realized that the house was on fire. She saw flames coming out of Rosemary's room but was unable to help her. Lynnita then jumped out the bedroom window, and Dashawn ran down the

3

stairs. Dashawn got Antonio, and they left the house together. Lynnita told a bystander that Danshi was still in the house, and the bystander went inside and rescued her.

{¶ 14} At 2:50 a.m. on November 11, the Toledo Fire Department received a call about a fire at 814 St. John Avenue. Firefighters arriving at the scene observed fire and heavy smoke coming from the back of the house. Firefighters entered the house and found the dead bodies of Rosemary and Sanaa' in the back upstairs bedroom. Mary and Jamal were found alive in the front upstairs bedroom. Attempts to resuscitate them were unsuccessful, and both died.

{¶ 15} On the morning of November 11, Toledo Detective William Gast spoke to Lynnita and Ebony at the hospital. They provided information that identified Powell as a possible suspect.

{¶ 16} Later that morning, police officers contacted Isaac Powell V, the defendant's youngest brother. Isaac told Officer Gast that Powell had been at his apartment earlier that morning. Isaac's apartment was 1.6 miles from Mary's house. Isaac consented to a search of his apartment, and the police found Powell's sweatpants in a closet. Isaac stated that Powell had been wearing those sweatpants when he arrived at his apartment that morning.

{¶ 17} At trial, Isaac testified that between 2:30 a.m. and 3:00 a.m. on November 11, Powell had awakened him by throwing rocks at his bedroom window. After Isaac let him inside, Powell told Isaac, "[M]an, I really fucked up. I fucked up. I fucked up." Isaac testified that Powell did not mention anything about gasoline. Isaac acknowledged that he testified before the grand jury that Powell had "told [him] that he put gas on the outside of the side door."

{¶ 18} Powell stayed at the apartment for the rest of the night. Isaac testified that Powell was still asleep when he left the apartment shortly after 6:00 a.m.

4

{¶ 19} Isaac's videotaped police statement was presented at trial. During that interview, Isaac told police that Powell had said that Mary "pissed [Powell] off about something." According to Isaac, Powell then said, "I went over there and * * * I was pacing in front of the house and * * * I found a little gas can on the side of the something and I threw a little gas on the side door and * * * set the door on fire."

{¶ 20} Officer Gast interviewed Charles Powell twice on November 11. During the second interview, Charles called Powell and encouraged him to turn himself in to the police.

{¶ 21} About 1:00 a.m. on November 12, Toledo Police Officer Lawrence Emery Jr. observed a person matching Powell's description walking down the street. Officer Emery asked the person his name, and he replied, "Ike." The officer determined that this individual was Powell and took him into custody.

{¶ 22} At approximately 1:45 a.m. on November 12, Officer Gast conducted a videotaped interview of Powell. After waiving his *Miranda* rights, Powell denied setting fire to Mary's house. Powell admitted that he had gone to Mary's house at 1:00 a.m. to get his boots and boxer shorts, but said that he left Mary's house and did not return.

{¶ 23} Powell stated that after he left Mary's house, he called her "all night," using his phone and his brother's phone (listed under the name of Charles's wife, Tamiko Williams). Powell stated that Mary had called him after he left.

{¶ 24} Powell said that he spent the night at Charles's house drinking and smoking crack. At one point, he went to Isaac's apartment, but Isaac would not answer the door. Powell then returned to Charles's home and slept there. Powell said that he woke up early the next morning and watched the 6:30 a.m. news and heard about the fire. Powell then walked to Isaac's apartment. Isaac let him

inside after Powell woke him up by throwing rocks at his window. Powell talked to his boss on the phone that morning and arranged a roofing job that day. Later, his boss picked Powell up at Isaac's apartment and took him to work.

{¶ 25} During the interview, Powell denied pouring gasoline on Mary's porch a few weeks earlier. He said, "I don't know nothing about that." Powell's clothing was seized during the interview. Powell stated that all the police would find is "a whole bunch of tar from a * * * roof."

{¶ 26} On November 13, Officer Gast obtained a buccal swab from Powell's cheeks and talked with him again. Gast mentioned that Powell's clothing was sent to the lab for testing. Powell replied, "[T]hey ain't going to get no gas." Powell mentioned that the clothes the police took from him, except for his boots, were the same clothes he had been wearing when he went to Mary's house to get his clothes. Powell stated that for Mary's security, he had put the board on the floor that had blocked Mary's side door, and it had been there for more than a year. He also installed the lock on the side door, but he did not have the key.

{¶ 27} Phone records showed that Powell made numerous phone calls to Mary on November 11. From his own phone, Powell called Mary's phone 52 times between 12:15 a.m. and 2:50 a.m. No calls were made from Powell's phone between 2:50 a.m. and 3:15 a.m. Powell again called Mary's phone at 9:44 a.m. and 9:45 a.m.

{¶ 28} Phone records for Tamiko Williams's phone showed that Powell made 36 phone calls to Mary's phone between 12:19 a.m. and 2:06 a.m. on November 11. No other outgoing calls were made from Williams's phone between 2:06 a.m. and 9:08 a.m.

**{¶ 29}** Mary's phone records showed that she made seven calls to Powell's phone between 12:19 a.m. and 2:06 a.m. on November 11. The last call from Mary's phone number was a 9-1-1 call at 2:45 a.m.

**{¶ 30}** On the morning of November 11, Frank Reitmeier, a fire investigator with the Ohio Fire Marshal's Office, examined the remains of Mary's home. Reitmeier found burn patterns on the landing area inside the house next to the side door. Reitmeier stated that these "burn patterns * * * indicated that * * * a liquid was poured on the landing and ignited."

**{¶ 31}** Reitmeier stated that the side door was burned and heavily charred on the interior side. There was a crack in the door, and Reitmeier stated that the "crack was actually burnt which means that the crack was in the door at the time of the fire and not caused after the fire." He also determined that force was applied to the door before the fire and that the door was closed when the fire started. Reitmeier was unable to tell whether the door knobs and dead bolt had been in place because they had melted. Reitmeier concluded that arson had caused the fire, which had originated on "the landing going from the kitchen to the basement, a landing where the side door entry is."

**{¶ 32}** Michael Smith, an arson investigator with the Toledo Fire Department, also examined the burned house. Smith's observations and findings were essentially the same as Reitmeier's. He concluded that the fire was "definitely an arson fire." Smith collected the board on the floor that was wedged between the side door and the wall in the landing area that kept the door closed. The top of the board was heavily burned. Smith stated that outside force appears to have been used to push in part of the side door. Smith explained:

When that door was pushed in I guess the board held the bottom closed but * * * [it] was free everywhere else once the lock

broke. It won't open up because of the boards at the bottom. That's how it creates the crease, and you have a flimsy side on the upperhand side you can push it open but you couldn't open the complete door because of the board at the bottom of the door, so there was an opening there.

{¶ 33} Smith also found a gasoline can in the vicinity. Swabs were collected from the handle of the gas can; subsequent testing did not locate any DNA.

{¶ 34} Christa Rajendram, Ph.D., a supervisor at the state fire marshal's forensic lab, tested floor samples from the side entry hallway and found gasoline. She also tested wood chips taken from the board on the side door landing and found gasoline. Dr. Rajendram tested Powell's clothing and found gasoline on his jeans, gym shorts, boxer shorts, two sweatshirts, and two T-shirts. Gasoline was also found on the sweatpants that had been found in Isaac's closet. Heavy petroleum distillate was found on Powell's boots and tube socks. Dr. Rajendram stated that "kerosene, diesel and some heavy charcoal starters" could be the source of heavy petroleum distillate.

{¶ 35} Diane Scala-Barnett, M.D., the Lucas County deputy coroner, conducted autopsies on the four victims. Dr. Scala-Barnett stated that burns and soot covered most of Rosemary's body. Dr. Scala-Barnett determined that Rosemary's cause of death was "the inhalation of smoke and soot, which caused carbon monoxide poisoning." Dr. Scala-Barnett testified that Mary, Jamal, and Sanaa' suffered burns and that soot covered their faces. She concluded that each of the victims had died from "acute carbon monoxide intoxication."

*Defense case*

{¶ 36} David Mariasy, an audio expert, conducted a comparison of the voice on Mary's voicemail recordings with a voice exemplar provided by Powell. The results of the testing were inconclusive.

{¶ 37} Carleton Finkbeiner, the mayor of Toledo at the time of the fire, had visited the scene. He remembers mentioning to a reporter that the police had the name of a potential suspect. Finkbeiner also stated that if the fire had been deliberately set, he "would prosecute to the fullest extent of the law." He did not order the home demolished. That decision would have been made by the director of the department of neighborhoods and her staff.

{¶ 38} Powell did not testify.

*Case history*

{¶ 39} Powell was indicted on ten counts of aggravated murder and one count of aggravated arson. Count 1 charged Powell with aggravated arson.

{¶ 40} Count 2 charged Powell with the aggravated murder of Mary McCollum with prior calculation and design. Count 6 charged Powell with the aggravated murder of Mary while committing aggravated arson. Both counts included death-penalty specifications for a course of conduct, R.C. 2929.04(A)(5), and murder while committing aggravated arson, R.C. 2929.04(A)(7).

{¶ 41} Count 3 charged Powell with the aggravated murder of Rosemary McCollum with prior calculation and design. Count 7 charged him with the aggravated murder of Rosemary while committing aggravated arson. Both counts included death-penalty specifications for a course of conduct and murder while committing aggravated arson.

{¶ 42} Count 4 charged Powell with the aggravated murder of Jamal McCollum-Myers with prior calculation and design. Count 8 charged him with the aggravated murder of Jamal while committing aggravated arson. Count 10

charged Powell with the aggravated murder of Jamal, a child under the age of 13. All three counts included death-penalty specifications for a course of conduct, murder while committing aggravated arson, and murder of a child under the age of 13, R.C. 2929.04(A)(9).

{¶ 43} Count 5 charged Powell with the aggravated murder of Sanaa' Thomas with prior calculation and design. Count 9 charged him with the aggravated murder of Sanaa' while committing aggravated arson. Count 11 charged him with the aggravated murder of Sanaa', a child under the age of 13. All three counts included death-penalty specifications for a course of conduct, murder while committing aggravated arson, and murder of a child under the age of 13.

{¶ 44} Powell pled not guilty, but the jury found him guilty of all counts. Powell was sentenced to death on four counts of aggravated murder. He was also sentenced to 10 years in prison for aggravated arson. Powell seeks reversal of his convictions and sentence in 26 propositions of law.

### *Pretrial and trial issues*

{¶ 45} *Prior statements of Isaac Powell*. In proposition of law I, Powell argues that Isaac's testimony relating what he told the grand jury about the defendant's admissions was improperly admitted as substantive evidence. Powell also argues that Isaac's videotaped statement to Detective William Gast was improperly admitted as a prior consistent statement. Furthermore, Powell contends that the trial court erred by failing to provide limiting instructions that that evidence could not be used substantively.

{¶ 46} 1. *Facts*. Isaac testified that Powell appeared at Isaac's apartment between 2:30 a.m. and 3:00 a.m. on November 11. Following Powell's arrival, Isaac went back to bed and left Powell in the living room.

**{¶ 47}** As Isaac's testimony progressed, the prosecutor asked, "Now, you have testified in a prior hearing in this case; is that correct?" Isaac responded that he had. Isaac then testified that after the fire, his "brother come [sic] up." Isaac added, "I really didn't want to hear nothing. He like, man, I really fucked up. I fucked up. I fucked up." The prosecutor then asked, "Did your brother ever talk to you about gasoline?" Isaac replied that he did not.

**{¶ 48}** In a session outside the jury's presence, the prosecutor asked the trial court to declare Isaac an "adverse party" so that the state could cross-examine him regarding his prior statement to the grand jury.[1] Before making his ruling, the trial court asked the prosecutor whether he had considered refreshing Isaac's recollection with the relevant portion of the grand jury transcript. The prosecutor stated that he would pursue that option before asking the court to declare Isaac an adverse party.

**{¶ 49}** While still outside the jury's presence, the prosecutor attempted to refresh Isaac's recollection by providing him with a transcript of the relevant portion of his grand jury testimony. The prosecutor showed Isaac the relevant passage from his prior testimony and asked him, "[A]fter having reviewed your prior statement is your memory refreshed regarding gasoline." Isaac replied, "Not really."

**{¶ 50}** The trial court ruled that all further questioning of Isaac should be continued in the jury's presence. When the questioning resumed, the prosecutor asked Isaac whether he remembered telling the grand jury that Powell had mentioned "gasoline" after the fire. Trial counsel objected and argued that the prosecution was attempting to impeach its own witness with a prior inconsistent statement. In the alternative, trial counsel requested a limiting instruction that the

---

1. Under Evid.R. 611(C), "When a party calls * * * a witness identified with an adverse party, interrogation may be by leading questions."

grand jury testimony could be used only for impeachment purposes and not for its substantive value. In response, the prosecutor stated, "At this point that witness was prepared to state on the record what he said in Grand Jury. That is not impeachment. That's testimony."

**{¶ 51}** The trial court overruled the defense objection. The court stated, "I have to agree with the State at this time. * * * [T]he Court's interpretation of what was about to occur was a statement by this witness of potentially refreshed recollection of what he stated to the Grand Jury."

**{¶ 52}** When the questioning resumed, the prosecutor asked Isaac, "What did you tell the Grand Jury under oath November 21st last year regarding gasoline that your brother had told you." Isaac replied, "I said that he told me that he put gas on the outside of the side door."

**{¶ 53}** During cross-examination, Isaac stated that he was "mistaken" in telling the grand jury that Powell had told him that he had poured gasoline on the side door. He stated that Powell never told him that. Isaac stated that he had been under "extreme pressure" before testifying to the grand jury because the police told him that he could be charged with aiding and abetting the murders. Isaac said, "[T]hey [the police] kind of light weight guided my testimony."

**{¶ 54}** Furthermore, over defense objection and before Detective Gast testified, the trial court permitted the prosecutor to play the videotaped statement that Isaac made to him on the morning of November 11. The court ruled that Isaac's videotaped statement was a prior *consistent* statement and was admissible to rebut an express or implied charge of improper influence raised by the defense. The trial court overruled a defense request for a limiting instruction that Isaac's videotaped statement could be considered to show that it was a prior consistent statement only and could not be considered as substantive evidence.

**{¶ 55}** In Isaac's videotaped statement, Isaac told police that Powell had come to his apartment on the morning of the fire and had said that he had "fucked up." According to Isaac, Powell told him that Mary had "pissed [him] off," and he went to her house. Isaac also stated that Powell told him that he found a gas can and "threw a little gas on the side door and * * * set the door on fire."

**{¶ 56}** 2. *Analysis*. The defense argues that Isaac's testimony about what he told the grand jury was improperly admitted as refreshed recollection. The state responds that Isaac properly testified after refreshing his memory by reviewing his previous grand jury testimony. We conclude that the record shows that Isaac's testimony was improper.

**{¶ 57}** Evid.R. 612 permits a party to use a writing to refresh a witness's recollection. Under the doctrine of present recollection refreshed, "the witness looks at the memorandum to refresh his memory of the events, but then proceeds to testify upon the basis of his present independent knowledge." *State v. Scott*, 31 Ohio St.2d 1, 5-6, 285 N.E.2d 344 (1972). The testimony of the witness whose recollection has been refreshed is the evidence, not the contents of the writing. *See* 1 Giannelli, *Evidence*, Section 612.3, at 578 (3d Ed.2010). Thus, "a party may not read the statement aloud, have the witness read it aloud, or otherwise place it before the jury." *State v. Ballew*, 76 Ohio St.3d 244, 254, 667 N.E.2d 369 (1996).

**{¶ 58}** The trial court correctly permitted the prosecutor to refresh Isaac's memory by requesting him to review the transcript of his grand jury testimony. Isaac never claimed to have forgotten what he told the grand jury, and he therefore testified that his review of his prior grand jury testimony did "[n]ot really" refresh his recollection regarding his testimony about gasoline. Isaac's negative response showed that his review of his grand jury testimony had failed to refresh his

recollection. Nevertheless, the prosecutor continued to refer to Isaac's grand jury testimony during further questioning.

{¶ 59} The prosecutor continued, "What did you tell the Grand Jury under oath * * * last year regarding gasoline that your brother had told you." This question simply elicited what Isaac told the grand jury rather than attempting to refresh his recollection as Evid.R. 612 requires. This prior out-of-court statement constituted inadmissible hearsay. *See State v. Clay*, 187 Ohio App.3d 633, 2010-Ohio-2720, 933 N.E.2d 296, ¶ 26 (5th Dist.); 1 Giannelli at 582.

{¶ 60} Powell also argues that Isaac's testimony was not properly admitted as a prior inconsistent statement under Evid.R. 613 and that the trial court erred by denying defense requests for a limiting instruction regarding the testimony. But at trial, Isaac's statements about his grand jury testimony were not offered as a prior inconsistent statement. Moreover, the state does not argue before this court that Isaac's statements were admissible as a prior inconsistent statement. Accordingly, these arguments can be disregarded.

{¶ 61} We now turn to whether Isaac's videotaped police statement was properly admitted as a prior consistent statement.

{¶ 62} The admission of Isaac's videotaped statement as a prior consistent statement was premised on the admissibility of Isaac's testimony about what he told the grand jury. There was no other basis for admitting Isaac's videotaped statement because it was otherwise objectionable hearsay. Thus, we conclude that Isaac's videotaped statement was improperly admitted as a prior consistent statement because its admissibility was based upon Isaac's earlier testimony, which was itself inadmissible.

{¶ 63} 3. *Harmless error.* We must now determine whether the erroneous admission of Isaac's testimony and his videotaped statement constituted harmless error. The state argues that any error in admitting Isaac's testimony and his

videotaped statement was harmless beyond a reasonable doubt. This harmless-error standard is applied to errors involving constitutional rights. *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

{¶ 64} The admission of Isaac's videotaped statement and related testimony constituted a hearsay violation. The admission of hearsay does not violate the Confrontation Clause if the declarant testifies at trial. *See California v. Green*, 399 U.S. 149, 155, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970); *State v. Keenan*, 81 Ohio St.3d 133, 142, 689 N.E.2d 929 (1998). Isaac testified at trial. Thus, the admission of Isaac's testimony and videotaped statement was nonconstitutional error, which "is harmless if there is substantial other evidence to support the guilty verdict." *State v. Webb*, 70 Ohio St.3d 325, 335, 638 N.E.2d 1023 (1994); Crim.R. 52(A) ("Harmless error and plain error").

{¶ 65} We find that the erroneous admission of Isaac's testimony and his videotaped statements constituted harmless error. Other properly admitted evidence provided overwhelming evidence of Powell's guilt: Powell's repeated statements that he "fucked up" when he arrived at Isaac's apartment shortly after the fire, Powell's heated discussion with Mary and Stuart before the fire, Powell's statement to Mary that she was "gonna F around and make him kill her," Powell's previous threat to burn down Mary's house, Powell's pouring of gasoline on Mary's front porch, gasoline found on the clothing that Powell had been wearing on the night of the fire, and the pattern of Powell's phone records and their timing on the night of the fire.

{¶ 66} Based on the foregoing, we overrule proposition of law I.

{¶ 67} *Demolition of the crime scene.* In proposition of law XI, Powell argues that his due process rights were violated when the city demolished the remains of Mary's house before defense experts had had a chance to examine

them. In proposition of law XII, Powell argues that his counsel were ineffective by failing to file a motion to preserve the home before it was demolished.

{¶ 68} *1. Facts.* The house at 814 St. John Avenue was burned on November 11, 2006. On January 26, 2007, the remains of the house were demolished by the city of Toledo.

{¶ 69} On December 4, 2006, John Thebes and Ann Baronas were appointed as Powell's counsel; they represented him throughout the trial. On February 1, 2007, defense counsel filed a motion to preserve and catalog all physical evidence. That same date, counsel filed a motion to make the state's physical evidence available for inspection and testing. On March 26, 2007, defense counsel requested funding for a defense arson expert. The trial court approved this request. But unbeknownst to the parties, the city of Toledo had demolished the house on January 26.

{¶ 70} On June 29, 2007, defense counsel filed a motion to dismiss the charges because the state had destroyed "potentially exculpatory evidence" before defense experts had had an opportunity to inspect and analyze the crime scene. At a hearing on August 6, 2007, defense counsel informed the court that they had first learned that the home had been demolished when they went to view it in late May or early June. Defense counsel stated that they had gone to the scene with Detective Gast and were "astonished to learn the house was razed."

{¶ 71} In response to the motion to dismiss, the prosecutor informed the court that "[a]fter the fire was extinguished, an Inspector from the City of Toledo Department of Neighborhoods inspected the house, finding it structurally unsound and a serious public safety concern. Consequently, the City of Toledo's Chief Building Official ordered the house's immediate demolition." During the August 6 hearing, the prosecutor stated, "[T]he Prosecutor's Office was not aware that the

house had been torn down until Mr. Thebes [defense counsel] and Detective Gast went out and viewed the house and that's when we became aware of it."

**{¶ 72}** The trial court denied the motion to dismiss, ruling that it found no bad acts or conduct on behalf of the state of Ohio. It concluded that the state and defense counsel both learned of the destruction of the building at the same time and place and that they were together when they learned of the destruction of the building. The court concluded that there was "no intentional destruction of either exculpatory material which this material was deemed not to be or potentially exculpatory and no bad acts on the part of the State of Ohio."

**{¶ 73}** *2. Analysis.* Specific tests are applied to determine whether the state's failure to preserve evidence rises to the level of a due process violation. The test depends on whether the lost or destroyed evidence involves "material exculpatory evidence" or "potentially useful evidence."

**{¶ 74}** In *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), the Supreme Court held that the government violates a defendant's due process rights when material exculpatory evidence is not preserved. Evidence is constitutionally material when it possesses "an exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 489. The defendant bears the burden to show that the evidence was materially exculpatory. *See State v. Jackson*, 57 Ohio St.3d 29, 33, 565 N.E.2d 549 (1991).

**{¶ 75}** In *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), the Supreme Court reviewed a case in which the state had failed to properly preserve semen samples and clothing obtained from a child who was the victim of a sexual assault. A police criminologist performed testing on the evidence but was unable to identify the assailant. *Id.* at 53-54. Expert witnesses

testified at trial that the defendant might have been completely exonerated by timely performance of tests on properly preserved semen samples. *Id*. at 54. The defendant was convicted of child molestation, sexual assault, and kidnapping. *Id*. at 52. The Arizona Court of Appeals reversed the conviction on the ground that the state had breached a constitutional duty to preserve the semen samples. *Id*.

{¶ 76} The Supreme Court reversed, stating:

> The Due Process Clause of the Fourteenth Amendment, as interpreted in *Brady*,[2] makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence. But we think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant.

*Id*. at 57. In that situation, the court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id*. at 58. *See also Illinois v. Fisher*, 540 U.S. 544, 545, 124 S.Ct. 1200, 157 L.Ed.2d 1060 (2004).

{¶ 77} *Youngblood* made a clear distinction between materially exculpatory evidence and potentially useful evidence. "If the evidence in question is not materially exculpatory, but only potentially useful, the defendant must show bad faith on the part of the state in order to demonstrate a due process violation." *State v. Geeslin*, 116 Ohio St.3d 252, 2007-Ohio-5239, 878 N.E.2d 1, ¶ 10.

---

2. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

{¶ 78} The initial question in this case is whether the demolition of the house involved the loss of materially exculpatory evidence. Fire investigators examined the remains of the house shortly after the fire was extinguished. They established that the fire had originated in the landing area inside the side door and that gasoline had been the accelerant used to start the fire. They concluded that arson caused the fire. Nothing suggests that materially exculpatory evidence was left in the remains of the home following completion of their investigation.

{¶ 79} Powell concedes that the defense cannot show that the evidence was materially exculpatory. Powell claims that the remains might have shown an alternative cause of the fire, such as an appliance or other cause unrelated to arson. The evidence was potentially useful, not materially exculpatory, because "no more can be said than that [the remains of the house] could have been subjected to tests, the results of which might have exonerated the defendant." *Youngblood*, 488 U.S. at 57, 109 S.Ct. 333, 102 L.Ed.2d 281. Thus, we conclude that the demolition of the house resulted in the loss of "potentially useful evidence," not the loss of "materially exculpatory evidence."

{¶ 80} Powell argues that although the evidence may have been only potentially useful, the state demonstrated bad faith in failing to protect and preserve the remains of the house. Powell contends that the house could have been protected with a fence and that the state's failure to preserve such key evidence was more than mere negligence or an error in judgment.

{¶ 81} Powell cannot prevail because the record does not reveal bad faith by the police or the prosecution. "The term 'bad faith' generally implies something more than bad judgment or negligence." *State v. Tate*, 5th Dist. No. 07CA55, 2008-Ohio-3759, ¶ 13. " 'It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud. It also embraces actual intent to

mislead or deceive another.' " *Hoskins v. Aetna Life Ins. Co.*, 6 Ohio St.3d 272, 276, 452 N.E.2d 1315 (1983), quoting *Slater v. Motorists Mut. Ins. Co.*, 174 Ohio St. 148, 187 N.E.2d 45 (1962), paragraph two of the syllabus.

**{¶ 82}** Neither the police nor the prosecution was aware that the Department of Neighborhoods had decided that the house presented a safety hazard and must be demolished. Indeed, defense counsel acknowledged that Detective Gast was as surprised as defense counsel when they saw that it had been demolished. Furthermore, the state was unaware that defense counsel wanted the home preserved as evidence. Defense counsel did not file a motion to preserve the remains of the home until after its demolition, even though they had time to make such a request between the time they were appointed and the time the house was demolished.

**{¶ 83}** Moreover, fire investigators photographed and videotaped the remains of the house and collected evidence from the scene and sent it to the lab for testing. This evidence was available for the defense expert to examine and test, but defense counsel declined the state's offer to have the defense's arson investigator examine these samples.

**{¶ 84}** Finally, the trial court, which was in the best position to weigh the evidence, concluded that "there [were] no bad acts or conduct on behalf of the State of Ohio with that property being destroyed." We conclude that Powell has failed to demonstrate bad faith by the state in the demolition of the house.

**{¶ 85}** As an alternative argument in proposition XII, Powell argues that his counsel provided ineffective assistance by failing to seek an order at the time of arraignment to preserve all the evidence in the case, which would have prevented the demolition of the house. Reversal of a conviction for ineffective assistance of counsel requires the defendant to show that counsel's performance was deficient and that the deficient performance prejudiced the defense so as to

deprive the defendant of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus.

{¶ 86} Powell claims that his counsel should have sought a court order to preserve the remains of the house because there was some indication of an alternative cause of the fire. Powell argues that a defense arson expert could develop such evidence only by examining the remains of the home. But Powell fails to specify an alternative cause of the fire or point to any evidence indicating that there was another cause. Thus, Powell's argument is purely speculative and cannot serve as the basis for an ineffectiveness claim. *See State v. Foust*, 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, ¶ 108.

{¶ 87} Even assuming that defense counsel were deficient, Powell fails to show how the failure to preserve the remains of the house made a difference in the outcome of the case. Powell's statement that he "fucked up," testimony that he threatened to kill Mary before the fire, evidence that gasoline was found on clothing he was wearing on the morning of the fire, testimony that Powell had previously threatened to burn down the home and had poured gasoline on the front porch, and other circumstantial evidence provided overwhelming evidence establishing his guilt. This ineffectiveness claim lacks merit.

{¶ 88} Based on the foregoing, we overrule propositions of law XI and XII.

{¶ 89} *Questioning the accused about counsel.* In proposition of law XXII, Powell argues that the trial court interfered with his attorney-client relationship by questioning Powell about his satisfaction with counsel. At a pretrial hearing on June 21, 2007, the trial court set a date of July 23, 2007, for a hearing on motions and "to address any other issues that parties may have at that time." The trial court advised the defendant, "[Y]ou have an issue that you want

to address with the court before July 23rd, just tell your attorneys, have them contact the court, and we'll have you brought over as soon as possible."

{¶ 90} On June 28, 2007, the trial court conducted an ex parte hearing with Powell and his defense counsel about a letter that Powell had sent to the judge. At the hearing, the trial court told Powell, "I have in front of me the letter that you sent me. * * * And in there you express a desire to speak with me regarding some concern you have or maybe your representation. What is it that you'd like to speak about?"

{¶ 91} Powell told the court, "I see myself as the only colored person or black person around. Everybody * * * is white." Powell also mentioned his health problems and the medication he was taking for anxiety and complained about his diet in jail.

{¶ 92} The trial court then asked Powell about his concerns about counsel's representation, stating, "[Y]ou're concerned that there may be some prejudice involved here because * * * you are a black man and Mr. Thebes [defense counsel] is a white man * * *." Powell didn't allude to specific prejudice, but to a general concern based on something he had seen on TV, stating, "I seen some Dr. Phil. They was talking about the death penalty and black people versus white people, and this is national TV, and I was like, well * * * it's not right, then it shouldn't still be going on. But it still be going on." Powell then stated of defense counsel, "[I]t's really not him personally. Every time I talk to him, I be telling him * * * [it's] the system I don't trust."

{¶ 93} The trial court attempted to clarify Powell's concerns about the fairness of the proceedings.

> The Court: * * * But what I'm not quite sure yet is if you're
> just asking me to do something in particular about the situation or

if you're just trying to make sure that I'm also watching the situation and monitoring it.

The Defendant: I think it's * * * more or less that I want * * * to be able to say or be able to know that the things that's going on in my head is on the record basically.

The Court: Right.

The Defendant: So just in case something happens where I have to even go down the road and appeals have to be done that I can * * * basically get all bases covered or something. That's what I'm thinking about.

{¶ 94} The trial court replied, "I also have to look down the road to make sure that everything is protected in case there is a conviction and in case there is a sentencing and in case there is a course of appeals, such as we're building a record right now." Before the hearing concluded, defense counsel stated to the court, "I am satisfied after talking with him this morning that he still wants me to be on the case and Ms. Baronas as well." Powell then reaffirmed that he was satisfied with his present counsel.

{¶ 95} The trial court acknowledged Powell's concerns that Powell was an African-American in a system in which the people not involved as defendant or victim were not African-Americans:

The Court: You've indicated that you don't want to have different counsel. You want to keep Mr. Thebes and Ms. Baronas; is that correct?

The Defendant: Yeah, yes.

> The Court: Will you inform the court if that changes at any
> point?
>
> The Defendant: Yeah, yes.

{¶ 96} At a pretrial hearing on August 6, 2007, the trial court informed Powell that the trial would begin in two days. The court stated, "We want to make sure we have everything taken care of and all your concerns are taken care of." Defense counsel responded, "After conferring with Mr. Powell I believe there is nothing further as far as Mr. Powell having any concerns." The court then told Powell that if something new develops, he should advise his attorneys "so they can bring it to the Court's attention."

{¶ 97} Powell argues that the trial court interfered with his attorney-client relationship by asking him to bring his concerns about counsel or other matters about the case to the court's attention because "it is inappropriate for the trial judge to come between the attorney and a criminal defendant." In *State v. Deal*, 17 Ohio St.2d 17, 244 N.E.2d 742 (1969), syllabus, this court stated, "Where, during the course of his trial for a serious crime, an indigent accused questions the effectiveness and adequacy of assigned counsel * * *, it is the duty of the trial judge to inquire into the complaint and make such inquiry a part of the record." This " 'limited judicial duty arises only if the allegations are sufficiently specific; vague or general objections do not trigger the duty to investigate further.' " *State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, 858 N.E.2d 1144, ¶ 68, quoting *State v. Carter*, 128 Ohio App.3d 419, 423, 715 N.E.2d 223 (4th Dist.1998).

{¶ 98} The record does not support Powell's claim that the trial court abused its discretion by asking Powell about his satisfaction with counsel. The trial court conducted the ex parte hearing into Powell's satisfaction with counsel because Powell sent a letter to the judge. Although the letter is not in the file, the

trial court's comments show that Powell raised concerns about his representation. The trial court's limited inquiry provided Powell with an opportunity to express any concerns to the court about his representation before the trial began.

{¶ 99} Powell informed the court that he was satisfied with his counsel. During his colloquy with the trial court, Powell also mentioned his concerns about the fairness of the trial because he was African-American, he had health problems, his conditions of confinement were poor, and the jail food "was junk." Powell's discussion about these matters shows that his real concerns focused on issues other than dissatisfaction with counsel. Moreover, trial counsel did not object to the hearing or any of the questions that the trial court asked. There is no indication that the trial court improperly meddled with Powell's attorney-client relationship.

{¶ 100} Powell invokes *State v. Bey*, 85 Ohio St.3d 487, 709 N.E.2d 484 (1999), in arguing that the trial court's questioning of a defendant improperly intruded into the attorney-client relationship. *Bey* held that "a trial court is not *required* to conduct an inquiry with the defendant concerning the decision whether to testify in his defense." (Emphasis sic.) *Id*. at 499. The court added that such an inquiry might be harmful because it " 'places the judge between the lawyer and his client and can produce confusion as well as delay.' " *Id*., quoting *People v. Curtis*, 681 P.2d 504, 519 (Colo.1984) (Erickson, C.J., concurring). *Bey* also mentioned that such "questioning can lead into the judge's evaluation of the wisdom of the defendant's decision, the substance of the testimony, or simply evoke a dramatic change in a previously carefully considered trial strategy." *Id*. *Bey* does not prohibit the court's questioning of a defendant.

{¶ 101} But regardless, *Bey* is inapposite. *Bey* had complained that the trial court did not address him directly on his decision to testify. The court's inquiry in this case is significantly different from an inquiry into the wisdom of a

defense decision that the defendant will not testify. The trial court avoided any attempt to counsel Powell or his attorney on how he should proceed in trying his case. Unlike in *Bey*, the trial court's inquiry focused on the continuing viability of the attorney-client relationship rather than the wisdom of the decisions reached within that relationship.

{¶ 102} Powell also argues that the trial court interjected itself between the defendant and counsel by asking Powell at the beginning of trial if he had any issues to address. This inquiry did not improperly intrude on the attorney-client relationship because the court told Powell, "[If] you have an issue that you want to address with the court * * * just tell your attorneys [and] have them contact the court* * *."

{¶ 103} Finally, Powell argues that the trial court confused him by describing the court's role when talking to him. The trial court's explanation about the court's role in overseeing the trial was discussed after Powell expressed his mistrust about the justice system. Contrary to Powell's claim, the trial court's explanation addressed Powell's concerns and ensured that he was not confused about the court's role.

{¶ 104} Based on the foregoing, we reject proposition of law XXII.

{¶ 105} *Evidence of the victim's fear*. In proposition of law II, Powell argues that the trial court erred in permitting Lynnita Stuart to testify that she carried a baseball bat, a potato grinder, and a fork when Powell came to Mary's house on the morning of the fire. As related previously, on November 11, Stuart had gone to Mary's house to retrieve clothing. Powell accused Stuart of having an affair with Mary.

{¶ 106} The prosecutor asked Stuart the following questions before concluding the inquiry into what happened on the porch:

Q: Okay. Did you think you were going to get in a fight with him on that porch?

A: For a minute. When I opened up the door I was ready. I had things in my hand.

Q: What did you have in your hand?

A: I had a baseball bat. I had a potato grinder and a fork.

Q: Calm yourself down. You had a baseball bat and what else?

A: A potato grinder and a fork.

Q: Okay. Did you get those things because you knew who was at the door?

A: Yes.

{¶ 107} Powell's counsel objected to Stuart's testimony as irrelevant character evidence about Powell. The state cited *State v. Apanovitch*, 33 Ohio St.3d 19, 514 N.E.2d 394 (1987), in arguing that Stuart's testimony implying her fear of Powell was admissible. The trial court overruled the defense objection, stating, "This is clearly the testimony of a witness and what she was doing and why she was doing it. She didn't even articulate as to a specific reason as to why she grabbed the stuff. She just did."

{¶ 108} The admission of Stuart's testimony rested on a question of relevancy. Evid.R. 401 provides: " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The admission or exclusion of relevant evidence rests within the sound discretion of the trial judge. *See State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987), paragraph two of the syllabus.

{¶ 109} Stuart's testimony about carrying weapons because Powell came to the door was irrelevant. Stuart's state of mind was not a material issue in the case. Moreover, the state fails to provide any reason why Stuart's actions and state of mind in carrying weapons might have been relevant. The state invoked *Apanovitch*, 33 Ohio St.3d 19, 514 N.E.2d 394, in arguing that Stuart's testimony was admissible. In *Apanovitch*, six witnesses testified that the victim had said that she was "fearful or apprehensive" of the defendant. *Id*. at 21. *Apanovitch* held that these statements were admissible as a hearsay exception under Evid.R. 803(3), as a statement of the declarant's " 'then existing state of mind, emotion, sensation, or physical condition.' " *Id*. at 21-22, quoting Evid.R. 803(3). *Apanovitch* did not discuss why the victim's fear of the defendant was relevant.

{¶ 110} *Apanovitch* has been applied to admit statements of a murder victim's fear in subsequent cases. *See State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, ¶ 74 (evidence of the victim's fearful state of mind was admissible under Evid.R. 803(3) but not the reasons for her state of mind). *Accord State v. Frazier*, 73 Ohio St.3d 323, 338, 652 N.E.2d 1000 (1995). In this case, however, we conclude that *Apanovitch* does not justify the admission of Stuart's testimony because her state of mind was irrelevant to any facts at issue. *See* 2 Giannelli, Section 803.16, 236-239. Moreover, Stuart's testimony suggested that Powell should be viewed as a bad person, evidence that is inadmissible under Evid.R. 404(A).

{¶ 111} Nevertheless, Stuart's testimony constituted harmless error. There is little chance that Stuart's testimony about carrying a baseball bat, a potato grinder, and a fork when Powell came to the door affected Powell's convictions or sentence.

{¶ 112} Based on the foregoing, we reject proposition of law II.

{¶ 113} *Miranda* **compliance**.  In proposition of law III, Powell argues that the trial court erred in admitting his November 13 interview, because the police failed to advise him of his *Miranda* rights before questioning him.  *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

{¶ 114} At around 1:45 a.m. on November 12, 2006, Detective Gast conducted a videotaped interview of Powell at the Safety Building.  Gast advised Powell of his *Miranda* rights before conducting this interview by reading them from a waiver-of-rights form.  Powell stated that he understood his rights and waived them.  Powell also signed a waiver form stating that he understood his rights, waived them, and was willing to answer questions and make a statement.  During the interview, Powell denied setting the fire at Mary's house.  He also provided detailed information about his activities on November 11 and 12.

{¶ 115} Around 12:30 p.m. on November 13, 2006, Powell was brought back to the Safety Building so that police could obtain a buccal swab that had been authorized by a search warrant.  Powell was not readvised of his *Miranda* rights.  Gast advised Powell about the warrant and that a swab would be taken to obtain a DNA sample.  Powell then asked, "What is that going to prove?"  Gast answered Powell's question.  Powell then stated that lab testing would not detect gasoline on his clothing.

{¶ 116} Thereafter, Gast asked Powell other questions about the case.  During the ensuing exchange, Powell acknowledged that his clothes that the police had seized, except his boots, were the clothes he had been wearing when he went to Mary's house.  He stated that the board that blocked the side door had been there for more than a year and that he did not have a key to the side door.  Powell did not request counsel or indicate that he wanted to stop further questioning while talking to Gast.

**{¶ 117}** Defense counsel filed a pretrial motion to suppress Powell's statements of November 12 and 13, arguing that Powell did not voluntarily waive his *Miranda* rights.  The trial court overruled the defense motion and admitted the statements.

**{¶ 118}** Powell argues that the trial court erred in admitting his November 13 statement because he was not advised of his *Miranda* rights before his second interview.  The state responds that Powell did not need to be readvised of his *Miranda* rights, because he had been advised of his rights the previous day.

**{¶ 119}** Police are not required to readminister *Miranda* warnings to a suspect when a relatively short period of time has elapsed since the initial warnings.  *State v. Treesh*, 90 Ohio St.3d 460, 470, 739 N.E.2d 749 (2001).  Courts look to the totality of the circumstances when deciding whether initial warnings remain effective for subsequent interrogations.  *State v. Roberts*, 32 Ohio St.3d 225, 232, 513 N.E.2d 720 (1987).  *Roberts* adopted the following criteria for determining whether the totality-of-the-circumstances test is met:

> "(1) [T]he length of time between the giving of the first warnings and subsequent interrogation, * * * (2) whether the warnings and the subsequent interrogation were given in the same or different places, * * * (3) whether the warnings were given and the subsequent interrogation conducted by the same or different officers, * * * (4) the extent to which the subsequent statement differed from any previous statements; * * * [and] (5) the apparent intellectual and emotional state of the suspect."

(Citations omitted.)  *Id.* at 232, quoting *State v. McZorn*, 288 N.C. 417, 434, 219 S.E.2d 201 (1975).

**{¶ 120}** More than 30 hours elapsed between the initial *Miranda* warnings and Powell's second interview. Admission of a defendant's statement has been upheld when a similar amount of time had passed after *Miranda* warnings. *See State v. Brewer*, 48 Ohio St.3d 50, 59, 549 N.E.2d 491 (1990) (statement admitted that was made one day after defendant was advised of his *Miranda* rights by a different police department); *State v. Barnes*, 25 Ohio St.3d 203, 208, 495 N.E.2d 922 (1986) (statement admitted that was made about 24 hours after defendant was advised of his *Miranda* rights).

**{¶ 121}** Review of the other *Roberts* criteria shows that the *Miranda* warnings were not stale. Powell remained in continuous custody during the interval between the two statements. Gast conducted both interviews at the same location. Moreover, Powell's second statement was primarily a more detailed retelling of the story he had already voluntarily told in his first statement, even though some new information was provided. Finally, the videotape interview shows that Powell was mentally alert on November 13.

**{¶ 122}** Based on these factors, we conclude, given the totality of the circumstances, that the initial *Miranda* warnings provided to Powell on November 12 were not stale when Gast met with Powell the next day. Thus, no new warnings were required.

**{¶ 123}** In addition, Powell did not need to be readvised of his *Miranda* rights, because he initiated the November 13 questioning about the case. *See Edwards v. Arizona*, 451 U.S. 477, 484-485, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Detective Gast informed Powell that the purpose of their meeting on November 13 was to obtain a buccal swab. Powell initiated further conversations by asking Gast, "What is that going to prove?" Thus, Powell "evinced a willingness and a desire" to talk further about the crime. *Oregon v. Bradshaw*,

462 U.S. 1039, 1045-1046, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983); *State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, ¶ 51.

{¶ 124} Nevertheless, Powell argues that his *Miranda* rights should have been readministered because he had been drinking and it was the middle of the night when he was advised of his *Miranda* rights on November 12. During the first interview, Gast testified that Powell "appeared to * * * have been drinking somewhat." Twice before the interview started, Powell blurted out that he was drunk and not faking it. He also appeared to stumble when he first entered the interview room.

{¶ 125} Before advising him of his *Miranda* rights, Gast asked Powell a series of questions to determine whether Powell was drunk. Powell stated his name and age, and knew that he was in the Safety Building. Powell stated that the date was November 11, but then acknowledged that it was actually November 12. Gast then said to Powell, "I'm going to ask you to try to pay attention, stay with me, okay?" Powell replied, "I'm with you one hundred percent, believe me." Powell also indicated some awareness about *Miranda* rights before Gast advised him of them. Based on Powell's responses, Gast concluded that he was not under the influence of alcohol.

{¶ 126} The rest of Powell's videotaped interview supports the conclusion that he was not drunk. Powell's speech became clearer once the interview began. He sat more erect in his chair, and his mannerisms became more controlled. Powell was also reasonably articulate and used legal terminology during the interview. When he changed into prison clothing midway through the interview, he was steadier on his feet.

{¶ 127} The videotape also shows that Powell was coherent, willingly answered Gast's questions, and expressed his understanding of the *Miranda* rights that were read to him on November 12. In addition, Powell signed a waiver of his

right to an attorney. This is strong evidence that the waiver was valid. *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979); *State v. Clark*, 38 Ohio St.3d 252, 261, 527 N.E.2d 844 (1988). We reject Powell's claim that his *Miranda* warnings were ineffective because he had been drinking.

{¶ 128} Even assuming that Powell's second statement was improperly admitted, any error was harmless beyond a reasonable doubt. Powell's November 13 statement was primarily a more detailed retelling of events discussed in his November 12 statement. Moreover, as discussed in proposition of law I, overwhelming evidence was introduced that established Powell's guilt. Based on the foregoing, we overrule proposition of law III.

{¶ 129} *Victim-impact testimony*. In proposition of law VII, Powell argues that the trial court erred in admitting victim-impact testimony that did not concern the deceased victims. In proposition of law VIII, Powell argues that his counsel provided ineffective assistance of counsel by failing to object to that testimony.

{¶ 130} Defense counsel filed a pretrial motion to exclude victim-impact testimony. The trial court denied this motion. Except where noted, defense counsel failed to renew its objection and thus waived all but plain error. *See Gable v. Gates Mills*, 103 Ohio St.3d 449, 2004-Ohio-5719, 816 N.E.2d 1049, ¶ 34.

{¶ 131} During the guilt phase, Felicia McCollum testified that her daughter Danshi had been hospitalized in the intensive care unit ("ICU") for burns and smoke inhalation caused by the fire. Felicia also testified that her son Antonio had been treated in the ICU for smoke inhalation. Antonio testified that he spent two days in the ICU.

{¶ 132} Lynnita Stuart testified that she was treated in the ICU after the fire. She suffered a closed head injury and broke her leg when she jumped from the second-floor window. She testified, "To this day my leg is still messed up. I don't think it will ever be the same." Over defense objection, Stuart testified that her leg continues to swell and that she cannot stand for long periods of time or dance anymore. Stuart also stated that although her son Dashawn had not needed medical treatment, the incident had affected him emotionally.

{¶ 133} Toledo fireman Terrance Glaze testified that he had treated one of the victims taken from the house and had put her in the ambulance. Later, he went to the hospital for his own injuries. Toledo fireman Glenn Hill testified that he treated one of the young victims and accompanied him to the hospital. These two firefighters and a third, Peter Jaegly, testified that they had attended a critical-incident debriefing session to help them deal with the aftermath of the fire.

{¶ 134} Victim-impact evidence is admissible in certain circumstances. It is admissible when it is related to "the facts attendant to the offense." *State v. Fautenberry*, 72 Ohio St.3d 435, 440, 650 N.E.2d 878 (1995). This court has also permitted victim-impact testimony in limited situations in capital cases "when the testimony is not overly emotional or directed to the penalty to be imposed." *Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, at ¶ 237.

{¶ 135} Powell invokes *State v. White*, 85 Ohio St.3d 433, 709 N.E.2d 140 (1999), in arguing that the victim-impact testimony relating to noncapital victims was improper. *White* held that victim-impact testimony to a jury about the impact on the victims of noncapital crimes in a capital-murder case was improper. *Id*. at 446-447. Unlike in *White*, the victims' testimony in this case was presented during the guilt phase. Testimony about the nature and extent of the survivors' injuries and their trauma was admissible because it was relevant in proving the facts attendant to the offense of aggravated arson in Count 1.

{¶ 136} In Count 1, the state was required to prove beyond a reasonable doubt that Powell created a "substantial risk of serious physical harm to any person other than the offender" by starting the fire. *See* R.C. 2909.02(A)(1) (aggravated arson). Under R.C. 2901.01(A)(5), "Serious physical harm to persons" includes the following:

> (b) Any physical harm that carries a substantial risk of death;

> (c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;

> * * *

> (e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

{¶ 137} Testimony about the nature and extent of the survivors' injuries was relevant in proving that Powell created a "substantial risk of serious physical harm" to the occupants of the house. Stuart's testimony about the long-term effects of her injuries showed that she suffered some "permanent incapacity" as a result of the fire. R.C. 2901.01(A)(5)(c). Testimony that Dashawn was affected emotionally by the fire is more questionable, but no plain error occurred.

{¶ 138} The statutory definition of "substantial risk of serious physical harm" to any person includes the creation of such a risk to firefighters. *See* R.C. 2909.01(A) and (B)(1)(a). Thus, fireman Glaze's testimony that he was treated at the hospital after the fire was admissible. Testimony that three of the firefighters

attended a critical-incident debriefing session after the fire was of questionable relevance. But no plain error resulted from admitting that testimony.

{¶ 139} We also reject Powell's argument that his counsel were ineffective in failing to object to victim-impact testimony. Trial counsel had no grounds for objecting to testimony about the nature and extent of the survivors' or the firefighters' injuries. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. Powell is also unable to show that he was prejudiced by testimony that one of the surviving children was affected emotionally by the fire or that some of the firefighters attended a debriefing session. *Id*.

{¶ 140} Based on the foregoing, we reject propositions of law VII and VIII.

{¶ 141} *Qualifications of expert witnesses*. In proposition of law IX, Powell argues that the trial court erred by allowing Frank Reitmeier, the state fire investigator, and Dr. Crista Rajendram, supervisor of the state fire marshal's forensic lab, to render expert opinions without determining that they were qualified to testify as experts. In proposition of law X, Powell argues that his counsel were ineffective by failing to object to Reitmeier's and Rajendram's testimony because they were not qualified as expert witnesses.

{¶ 142} At trial, Reitmeier testified that burn patterns indicated that a liquid had been poured on the side-door landing and had been ignited. He also testified that the side door had been forced before the fire started, and he concluded that arson was the cause of the fire. Rajendram testified that gasoline had been found on floor samples taken from the side-door landing. She also found gasoline on Powell's clothing.

{¶ 143} The state did not formally tender Reitmeier or Rajendram as an expert witness before they testified. Defense counsel did not object to the testimony of either witness or challenge their qualifications. Thus, Powell has

waived all but plain error. *See State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 125.

{¶ 144} Evid.R. 702(B) provides that "a witness may testify as an expert" by reason of his or her "specialized knowledge, skill, experience, training, or education." But "[n]either special education nor certification is necessary to confer expert status upon a witness. The individual offered as an expert need not have complete knowledge of the field in question, as long as the knowledge he or she possesses will aid the trier of fact in performing its fact-finding function." *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 148.

{¶ 145} During his testimony, Reitmeier mentioned some of his qualifications as a fire investigator. Reitmeier testified that he has 30 years of experience in the fire service and spent 15 years investigating fires for the insurance industry before starting work at the state fire marshal's office. He has investigated more than 1,000 fires and has testified in court more than 15 times. It is clear that Reitmeier's background and experience qualify him to testify as an expert on the causation and origin of the fire. Given his qualifications, the trial court's failure to qualify Reitmeier as an expert was of no consequence and did not result in plain error. *See Davis* at ¶ 153.

{¶ 146} Dr. Rajendram also testified about her background and experience. She stated that she has supervised the forensic lab since 1999 and that she analyzes fire debris. Dr. Rajendram has a Ph.D. from North Carolina State University and has taken various courses in fire-debris analysis. She is a member of a technical working group for "fire and explosion" that meets annually. It is clear that Dr. Rajendram's experience and training qualify her to testify as an expert witness. Based on her qualifications, the trial court's failure to qualify Rajendram as an expert was of no consequence and did not result in plain error. *See id.* at ¶ 153.

**{¶ 147}** We also reject Powell's claim that trial counsel were ineffective by failing to object to Reitmeier's and Rajendram's testimony, because both witnesses were qualified to testify as expert witnesses. Moreover, by not challenging Reitmeier's and Rajendram's qualifications, trial counsel avoided inviting the prosecutor to ask questions that might bolster their qualifications in the eyes of the jury. *See Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, at ¶ 128. Given the strong presumption that counsel's performance constituted reasonable assistance, we conclude that trial counsel's actions may have been a "tactical decision." *See Bradley*, 42 Ohio St.3d at 144, 538 N.E.2d 373.

**{¶ 148}** Based on the foregoing, we overrule propositions of law IX and X.

**{¶ 149}** *Prosecutorial misconduct during closing arguments*. In proposition of law IV, Powell argues that the prosecutor committed misconduct during his guilt-phase closing arguments. "The test regarding prosecutorial misconduct in closing arguments is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant." *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). Prosecutors are granted wide latitude in closing argument, and the effect of any conduct of the prosecutor during closing argument must be considered in light of the entire case to determine whether the accused was denied a fair trial. *State v. Maurer*, 15 Ohio St.3d 239, 266, 269, 473 N.E.2d 768 (1984). The touchstone of the analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

**{¶ 150}** First, Powell argues that the prosecutor made an improper victim-impact argument by stating:

This is a case about a family, a close family. They didn't have much. Little house, not in the best neighborhood, but they had each other, mothers, daughters, sisters, brothers, cousins. They would all gather to help each other out, to watch each other's kids. Mary McCollum's house was the social center of this family.

Three generations came together on November 11, 2006, at 814 St. Johns in Toledo. Eight people walked into that house and only four people walked out.

{¶ 151} Trial counsel failed to object to this testimony and thus waived all but plain error. *State v. Childs*, 14 Ohio St.2d 56, 236 N.E.2d 545 (1968), paragraph three of the syllabus.

{¶ 152} The prosecutor's comments were clearly permissible. The prosecutor's brief description of the victims and their relationship was based on evidence presented at trial and summarized what happened in the case. *See State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 226; *see also State v. Smith*, 80 Ohio St.3d 89, 107, 684 N.E.2d 668 (1997) ("proving the facts of a murder necessarily involves disclosure of details as to the victims and their lives"). Thus, no plain error occurred.

{¶ 153} Second, Powell argues that the prosecutor improperly commented on Powell's demeanor and the clothes that he was wearing, when the prosecutor stated, "But, ladies and gentleman, you are not here to judge this man as he sits here today in his nice suit and his pleasant demeanor which you have seen all week." Counsel objected, and the trial court sustained the objection.

{¶ 154} The prosecutor's argument addressed the obvious difficulty the jury faced in finding that Powell intended to kill everyone in the house, including children. The argument focused the jury's attention on Powell's actions at the

time of the fire by highlighting the difference between that behavior and his normal-looking appearance in court. The prosecutor's comments were "within the creative latitude accorded to both parties" in closing argument. *See, e.g.*, *State v. Nields*, 93 Ohio St.3d 6, 38, 752 N.E.2d 859 (2001). Even assuming that the prosecutor's comments were improper, any error was corrected by the trial court's instructions to disregard. *See State v. Garner*, 74 Ohio St.3d 49, 59, 656 N.E.2d 623 (1995) (the jury is presumed to follow the trial court's curative instructions).

{¶ 155} Third, Powell argues that the prosecutor improperly commented on his right to remain silent when, in discussing Powell's unwillingness to talk to the police, the prosecutor said, "The Defendant refuses to come in even after his brother talks to him at the insistence of Detective Gast. He refuses to come in. Imagine what has just occurred. And he refuses to come in to assist." The trial court sustained a defense objection to this argument and ordered the jury "to disregard the last comment."

{¶ 156} In *State v. Leach*, 102 Ohio St.3d 135, 2004-Ohio-2147, 807 N.E.2d 335, syllabus, this court held: "Use of a defendant's pre-arrest silence as substantive evidence of guilt violates the Fifth Amendment privilege against self-incrimination." In *Leach*, two women called the police and accused the defendant of attempted rape and other crimes. Id. at ¶ 3. During the state's case-in-chief, the police investigator testified that one of the victims provided him with the defendant's phone number. Id. at ¶ 4. The investigator called the defendant and made an appointment to talk with him the next day. Id. at ¶ 5. The investigator testified that the defendant did not keep the appointment and left a message on the police answering machine that he wanted to speak with an attorney before talking with the police. *Id.*

{¶ 157} In finding that the state violated the defendant's Fifth Amendment rights, *Leach* explained: "The state in this case presented testimony that Leach,

who had not yet been arrested or Mirandized, remained silent and/or asserted his right to counsel in the face of questioning by law enforcement. This testimony was clearly meant to allow the jury to infer Leach's guilt. Otherwise, jurors might reason, Leach would have offered his version of events to law enforcement." *Id.* at ¶ 25.

{¶ 158} *Leach* applied the rationale set forth in *Combs v. Coyle*, 205 F.3d 269 (6th Cir.2000). *Leach* at ¶ 28-31. *Combs* held that the prosecutor's use of a defendant's statement to a police officer at the scene of the crime, "Talk to my lawyer," violated his Fifth Amendment right against self-incrimination. *Combs* at 283-285. The Sixth Circuit Court of Appeals applied a two-part analysis and "determined that (1) admitting evidence of pre-arrest silence substantially impairs the policies behind the privilege against self-incrimination; and (2) the government's use of pre-arrest silence in its case-in-chief is not a legitimate government practice." *Leach* at ¶ 28, citing *Combs* at 285. Consequently, the Sixth Circuit concluded that the use of prearrest silence as substantive evidence of guilt was an impermissible burden upon the exercise of the Fifth Amendment privilege. *Id.*

{¶ 159} *Leach* applies to the prosecutor's argument that Powell refused to turn himself in and assist the police. This argument implied that Powell had something to hide by not turning himself in and telling the police what happened. Under *Leach*, this was an improper comment on Powell's prearrest silence and violated his Fifth Amendment privilege against self-incrimination.

{¶ 160} *Leach* addressed improper testimony about the defendant's prearrest silence during the state's case-in-chief rather than in comments made during closing argument. Statements made in closing arguments concerning a defendant's protected prearrest silence are analogous to comments made during the case-in-chief. Such comments are clearly improper. *See Griffin v. California*,

380 U.S. 609, 615, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). We conclude that the prosecutor's argument improperly commented on Powell's prearrest silence.

{¶ 161} The state argues that Powell waived objection to the prosecutor's argument by failing to properly object. Detective Gast testified that Charles called Powell and encouraged him "to come turn himself in, make himself available to the police, try to figure out where he was located." Trial counsel made a hearsay objection to this testimony. Yet Gast's testimony was different from the prosecutor's argument. Gast did not testify that Powell refused to turn himself in and assist the police. Thus, trial counsel did not have a sufficient basis for objecting to Gast's testimony on Fifth Amendment grounds.

{¶ 162} We conclude that the prosecutor's improper argument constituted harmless error beyond a reasonable doubt for three reasons. *See State v. Thompson*, 33 Ohio St.3d 1, 4-5, 514 N.E.2d 407 (1987) (recognizing that a violation of a defendant's constitutional right against self-incrimination is subject to harmless-error review). First, the trial court immediately sustained a defense objection to the prosecutor's argument and ordered the jury to disregard it. *See Garner*, 74 Ohio St.3d at 59, 656 N.E.2d 623. Second, the prosecutor's improper comments were brief and isolated. Third, overwhelming evidence was presented that established Powell's guilt. Thus, there is little chance that the prosecutor's improper remarks affected the verdict or sentence in this case.

{¶ 163} Finally, Powell claims that the prosecutor improperly argued that a defense expert would have reached the same conclusion about the cause of the fire as the state's experts. During this argument, the prosecutor commented about the house, stating, "It was preserved for 77 days. And yet they insinuate that more should have been done. There was some conspiracy to prevent their experts looking at this. They even brought in the Mayor to try to establish that as if their

experts would reach different conclusions." The defense objected, and the trial court sustained the objection.

{¶ 164} The prosecutor's argument responded to defense cross-examination that was aimed at showing that the state failed to preserve the remains of the home for further examination. "A prosecutor can respond to issues raised by an accused." *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, ¶ 101. It is questionable whether the prosecutor's comment about a "conspiracy" represented a fair inference based on the record. Moreover, the prosecutor's comment "as if their experts would reach different conclusions" was highly speculative and improper. Nevertheless, there is little chance that these isolated comments were prejudicial. The trial court sustained a defense objection and ordered the jury to disregard these comments. Any errors were also corrected by the trial court's instructions that the arguments of counsel were not evidence and that the jury was the sole judge of the facts. *See State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 163.

{¶ 165} Based on the foregoing, we overrule proposition of law IV.

{¶ 166} *Instructions*. In proposition of law VI, Powell argues that he was prejudiced by the trial court's erroneous jury instructions.

{¶ 167} First, Powell argues that the instructions defining causation undermined the burden of proof on the element of specific intent on the aggravated-murder charges. Powell objects to the following instruction: "Cause is an act which directly produces the death of a person and without which it would not have occurred. The Defendant is also responsible for the natural and foreseeable consequences that follow, in the ordinary course of events, from the unlawful act."

{¶ 168} We have recognized that the use of the foreseeability instruction in aggravated-murder cases is questionable. *See State v. Burchfield*, 66 Ohio

St.3d 261, 263, 611 N.E.2d 819 (1993); *State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, ¶ 54. We have also stated, however, that "[t]he use of that instruction * * * does not require reversal where the instructions as a whole make clear that the jury must find purpose to kill in order to convict." *State v. Phillips*, 74 Ohio St.3d 72, 100, 656 N.E.2d 643 (1995).

{¶ 169} In the present case, the trial court provided the jury with extensive instructions on the state's burden of proof and purpose to kill before the foreseeability instructions were given to the jury. Thus, the instructions as a whole made clear that the jury was required to find purpose to kill in order to convict.

{¶ 170} Second, Powell argues that the instructions on transferred intent diluted the instructions on "purpose." Powell objects to the following instructions:

> If you find that the Defendant did have a purpose to cause the death of a particular person and that the act accidentally caused the death of another person, then the Defendant would be just as guilty as if the act had taken effect upon the person intended.
>
> The purpose required is to cause the death of another, not any specific person. If the act missed the person intended, but caused the Defendant [sic] another, the element of purpose remains and the offense is as complete as though the person for whom the act was intended had died.

{¶ 171} The trial court's instructions on transferred intent were not improper. "The doctrine of transferred intent is firmly rooted in Ohio law." *State v. Sowell*, 39 Ohio St.3d 322, 332, 530 N.E.2d 1294 (1988). "If one purposely

causes the death of another and the death is the result of a scheme designed to implement the calculated decision to kill someone other than the victim, the offender is guilty of aggravated murder in violation of R.C. 2903.01(A)." *State v. Solomon*, 66 Ohio St.2d 214, 421 N.E.2d 139 (1981), paragraph one of the syllabus. *See also Bradshaw v. Richey*, 546 U.S. 74, 75, 126 S.Ct. 602, 163 L.Ed.2d 407 (2005) (Sixth Circuit erred in holding that transferred intent was inapplicable to aggravated felony murder under R.C. 2903.01(B)).

{¶ 172} Based on the foregoing, we overrule proposition of law VI.

{¶ 173} *Reasonable-doubt standard*. In proposition of law V, Powell challenges the constitutionality of the statutory definition of reasonable doubt. We have repeatedly affirmed the constitutionality of the reasonable-doubt standard set forth in former R.C. 2901.05(D), now in 2901.05(E). 2008 Sub.S.B. No. 184. *See, e.g.*, *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 122. Proposition of law V is rejected.

{¶ 174} *Sealing the prosecutor's file*. In proposition of law XIV, Powell argues that the trial court erred by refusing the defense request to have the prosecutor's file sealed for appellate review. The defense filed a pretrial motion requesting that a complete copy of the prosecutor's file be made, turned over to the trial court to review, and sealed for appellate review. The defense asserted that this was necessary to ensure the complete disclosure of exculpatory and impeachment evidence as required by *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The trial court denied this motion.

{¶ 175} Powell cites *State v. Brown*, 115 Ohio St.3d 55, 2007-Ohio-4837, 873 N.E.2d 858, in arguing that the trial court should have sealed the prosecutor's file to ensure that the state complied with *Brady*. In *Brown*, defense counsel found undisclosed police reports in the prosecutor's file, and the defense requested that it be sealed for appellate review. *Id.* at ¶ 42-45. *Brown* held that

these documents contained material evidence and that the state's failure to disclose this information violated *Brady*. *Id*. at ¶ 50. *Brown* does not support Powell's claim because *Brown* did not address the issue whether a prosecutor's file must be sealed.

{¶ 176} Nothing indicates that the prosecutor withheld *Brady* material in the present case. Moreover, in opposing the defense motion to seal the prosecutor's file, the prosecutor assured the court that it was "fully aware of its obligation to share potentially exculpatory information with the Defendant." The trial court was not required to examine or seal the prosecutor's file based on speculation that the prosecutor might have withheld exculpatory evidence. *See Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, at ¶ 123. Thus, we reject proposition of law XIV.

### *Penalty-phase issues*

{¶ 177} *Prosecutorial misconduct during closing arguments*. In proposition of law XVII, Powell argues that the prosecutor committed misconduct during closing arguments. Unless noted, defense counsel did not object to the alleged acts of prosecutorial misconduct and thus waived all but plain error. *Childs*, 14 Ohio St.2d 56, 236 N.E.2d 545, at paragraph three of the syllabus.

{¶ 178} First, Powell contends that the prosecutor improperly commented on Powell's exercise of his right to remain silent in stating: "You have Wayne Powell not even acknowledging the act." The prosecutor's statement responded to the testimony of Dr. Wayne Graves, the defense psychologist, who testified that "Wayne is not able to acknowledge that he did this. I think because the emotional impact that it has on him and * * * it appears to have occurred while he was drunk or high in the midst of intensifying conflict with Mary, the victim, and the others." The prosecutor's argument represented a fair comment that could be made from

the record. The prosecutor mentioned nothing that commented on Powell's exercise of his right to remain silent. Thus, no plain error occurred.

{¶ 179} Powell also complains that the prosecutor improperly commented on Powell's exercise of his right to remain silent and encouraged the jury to have sympathy for the victim during his rebuttal argument: "Think about that. Never takes responsibility. How is a life sentence going to be adequate in a case like this?" Again, the prosecutor was not commenting on Powell's exercise of his right to remain silent. He was responding to defense testimony about Powell's inability to acknowledge his crimes. Nothing in these remarks indicates that the prosecutor was encouraging the jury to sympathize with the victim. In addition, the trial court sustained a defense objection to these remarks and ordered the jury to disregard them. These instructions cured any possible error. *See State v. Goff*, 82 Ohio St.3d 123, 135, 694 N.E.2d 916 (1998).

{¶ 180} Second, Powell asserts that the prosecutor improperly aggregated the aggravating murder counts by stating, "I submit to you the aggravating circumstances in this case have incredibly great weight. During the course of conduct or killing or attempting to kill two or more people. There were eight people in that house. Four people died. That's a huge significant item." The prosecutor argued the weight that should be given to the R.C. 2929.04(A)(5) course-of-conduct specifications. Nothing in the prosecutor's argument suggested that the jury should aggregate the aggravated murder counts in arriving at the sentence. Even assuming that the prosecutor's remarks were misconstrued, the trial court instructed the jury, "The penalty for each separate count must be determined separately. Only the aggravating circumstances related to a given count may be considered and weighed against the mitigating factors in determining the penalty for that count." Thus, the trial court's instructions cured any possible error.

{¶ 181} Third, Powell claims that the prosecutor improperly referred to the nature and circumstances of the offense as an aggravating circumstance during rebuttal arguments. Powell complains about the following argument:

> Mr. Braun [prosecutor]: * * * He set a fire in such a way that he trapped people inside a house.
> Ms. Baronas [defense counsel]: Objection, Your Honor.
> * * *
> The Court: Objection is overruled.
> Mr. Braun: Knowing people were going to die. Knowing there was going to be more than one person that was going to die. He knew Rosemary McCollum was not going to get out of that house because she was an invalid in a bed. He knew that house was full of kids. He knew the stairway was blocked. That's what he did.

{¶ 182} The defense counsel opened the door to the prosecutor's rebuttal argument. The rebuttal responded to defense counsel's argument, "Despite my best efforts of showing you * * * that Wayne * * * didn't intend for this to happen, he was drinking and drug abuse [sic], probably when this happened." The rebuttal also responded to other defense arguments suggesting that Powell was "impulsively act[ing] out upon being rejected." Both parties have latitude in responding to arguments of opposing counsel. *State v. Loza*, 71 Ohio St.3d 61, 78, 641 N.E.2d 1082 (1994). We conclude that the prosecutor's rebuttal represented fair comment and was not improper.

{¶ 183} Fourth, Powell claims that the prosecutor's argument improperly mentioned the nature and circumstances of the offense and improperly referred to the victim's feelings at the time of the fire:

> Mr. Braun: * * * How does that relate to these aggravating circumstances? He used fire as a weapon. How serious is fire as a weapon? You heard from a whole bunch of witnesses during the first phase what that house was like. You heard from the firefighters crawling on their hands and knees looking for bodies in that house because they couldn't see, and they had to feel their way along the floor, and they were men in protective gear. Can you imagine what it was like inside that house?
>
> Ms. Baronas: Objection, Your Honor.
>
> The Court: Overruled.
>
> Mr. Braun: That's the aggravated arson specification you have to consider in this case.

{¶ 184} The prosecutor did not improperly refer to the nature and circumstances of the offense. The prosecutor's rebuttal addressed the facts and circumstances surrounding the aggravated-arson specification and explained why those facts and circumstances outweighed the mitigation.

{¶ 185} The argument that asked the jury to "imagine what it was like inside that house" was improper. Prosecutorial comments referring to the suffering and mental anguish that victims endured are improper because they ask the jury to speculate on facts not in evidence. *See State v. Combs*, 62 Ohio St.3d 278, 283, 581 N.E.2d 1071 (1991). Even so, the prosecutor's comments were brief and did not dwell on the victims' anguish and suffering. We conclude that

these comments did not deprive Powell of a fair sentencing determination or prejudicially affect any other substantial right.

{¶ 186} Based on the foregoing, we overrule proposition of law XVII.

{¶ 187} *Instructions*.  In proposition of law XVIII, Powell argues that the trial court's failure to provide proper penalty-phase instructions violated his rights and requires a new sentencing hearing.  First, Powell contends that the trial court erred by refusing the defense request to instruct the jury to consider mercy in its deliberations.  Powell was not entitled to an instruction on mercy.  *Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, at ¶ 190; *State v. Lorraine*, 66 Ohio St.3d 414, 417, 613 N.E.2d 212 (1993).

{¶ 188} Second, Powell argues that the trial court's failure to instruct on the burden of proof for mitigating factors may have caused the jury to believe that the mitigating factors must be proven beyond a reasonable doubt.  Powell argues that the jury should have been instructed that the burden of proof was a preponderance of the evidence.  *See State v. Jenkins*, 15 Ohio St.3d 164, 171-172, 473 N.E.2d 264 (1984).  The trial court instructed the jury: "Wayne Powell does not have any burden of proof."  This is a more favorable instruction for the defense than the absent instruction.  *See Frazier* at ¶ 196.  We reject this claim.

{¶ 189} Finally, Powell argues that the penalty-phase instructions failed to define the term "principal offender" as it is used in the statutes delineating aggravating circumstances for aggravated arson, R.C. 2929.04(A)(7), and death of a child, R.C. 2929.04(A)(9).  The defense failed to request an instruction defining the term "principal offender" during the penalty phase and thus waived all but plain error.  *See State v. Chinn*, 85 Ohio St.3d 548, 559, 709 N.E.2d 1166 (1999).

{¶ 190} Powell claims that the jury should have been advised that the term "principal offender" means the "actual killer."  The trial court had repeatedly told the jury that the term "principal offender" means the "actual killer" during the

guilt-phase instructions on the elements of the R.C. 2929.04(A)(7) and 2929.04(A)(9) specifications. Thus, no plain error occurred.

{¶ 191} Based on the foregoing, we overrule proposition of law XVIII.

{¶ 192} *Residual doubt*. In proposition of law XXI, Powell argues that the trial court's refusal to instruct on residual doubt as a mitigating factor violated his constitutional rights. Powell was not entitled to an instruction on residual doubt. *See State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 260; *State v. McGuire*, 80 Ohio St.3d 390, 686 N.E.2d 1112 (1997), syllabus. We overrule proposition of law XXI.

{¶ 193} *Postverdict discussions with the jury*. In proposition of law XIX, Powell argues that the trial judge erred in conducting an off-the-record ex parte discussion with the jurors after the jury had returned its penalty-phase verdict but before the trial court imposed sentence. After the penalty-phase verdict was announced, the trial judge informed the jurors that their service inside the courtroom was completed. The judge then stated, "I do believe it would be appropriate to spend a little bit of time with you. We thank you for your service in advance and on behalf of all the parties, and we will see you back in the jury deliberation room in just a moment."

{¶ 194} We have previously considered and rejected identical arguments raising this issue. *See Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, at ¶ 210-214; *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 152-153; and *State v. Williams*, 99 Ohio St.3d 439, 2003-Ohio-4164, 793 N.E.2d 446, ¶ 96-99. We reject Powell's arguments.

{¶ 195} First, when the trial court noted that he would speak with the jurors, counsel did not object. By making no complaint, the defense waived any objection. *Frazier* at ¶ 212. Second, Powell's claim that the trial court may have been influenced by the jury is totally speculative because there is no evidence

about what was discussed. Moreover, Powell has not attempted, in his effort to show prejudice, to reconstruct what the trial court discussed with the jurors. *See* App.R. 9(B) and (E); *Frazier* at ¶ 213. Thus, Powell has failed to establish prejudice from any conversations that the judge may have had with the jury. Finally, "when the judge and jury met, the jurors had satisfied their official task and were free to discuss the case." *Williams*, 99 Ohio St.3d 439, 2003-Ohio-4164, 793 N.E.2d 446, at ¶ 99. Moreover, the trial court is presumed to consider " 'only the relevant, material, and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary.' " *State v. Post*, 32 Ohio St.3d 380, 384, 513 N.E.2d 754 (1987), quoting *State v. White*, 15 Ohio St.2d 146, 151, 239 N.E.2d 65 (1968). Thus, we overrule proposition of law XIX.

### *Ineffective assistance of counsel*

{¶ 196} In propositions of law XIII and XV, Powell raises various claims that his counsel provided ineffective assistance of counsel during both phases of the trial.

{¶ 197} In proposition XIII, Powell claims that his counsel failed to preserve meritorious issues during the trial. Powell does not, however, cite any record references or mention any specific meritorious issues that counsel failed to preserve. Thus, Powell has failed to establish deficient performance or prejudice. We reject proposition XIII.

{¶ 198} In proposition XV, Powell makes numerous claims alleging trial counsel's ineffective assistance.

{¶ 199} **1. Inadequate voir dire**. Powell argues that his counsel provided ineffective assistance by failing to ask any follow-up questions of prospective jurors who displayed a reluctance to impose the death penalty. "The conduct of voir dire by defense counsel does not have to take a particular form, nor do specific questions have to be asked." *State v. Evans*, 63 Ohio St.3d 231, 247, 586

N.E.2d 1042 (1992). Moreover, "counsel is in the best position to determine whether any potential juror should be questioned and to what extent." *State v. Murphy*, 91 Ohio St.3d 516, 539, 747 N.E.2d 765 (2001).

{¶ 200} Powell cites three prospective jurors whom counsel should have rehabilitated: Morgan, Nelson, and Crego. During voir dire, these jurors stated that they were opposed to the death penalty and could not sign a death verdict. Trial counsel were not deficient by failing to ask follow-up questions of these jurors after they had expressed intractable views opposing the death penalty. *See Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, at ¶ 222.

{¶ 201} **2. Failure to ensure a complete record**. Powell argues that his counsel were ineffective by failing to object to unrecorded discussions about the guilt-phase jury instructions.

{¶ 202} At the conclusion of the presentation of guilt-phase evidence, the trial court released the court reporter for the day and told the parties that they would remain to "work on any issues we have as far as jury instructions and then meet here again tomorrow morning." Powell was not present during the ensuing meeting. The trial court said the following to Powell before he left:

> Mr. Powell, what we will do is we are going to look over the instructions as we have them now before any argument is made on the instructions. Mr. Thebes and Miss Baronas will have a * * * working copy of the proposed instructions which they will then review with you.
>
> At that time we can place * * * any arguments on the record after you have been counseled with and while you are present. We are not going to do anything other than logistical organization of trying to get things in place so that once an agreement has been

made as to what the instructions should be we can reasonably prepare those and have them ready for use with the jury sometime tomorrow * * *.

{¶ 203} On the following day, the parties presented arguments on the proposed guilt-phase instructions.  These arguments addressed instructions on foreseeability, transferred intent, and the definition of a deadly weapon.  In addition, the court addressed defense requests for instructions on Isaac's testimony, for a defense request for specialized verdict forms, and for a defense motion requiring the state to make an election on their theory of the case.

{¶ 204} During the next day's proceedings, the trial court indicated that there had been other discussions about the instructions.  The following discussion ensued:

The Court:  * * * [T]here were two other issues that were brought up on Friday as we were considering the corrections to the jury instructions.  We ended up engaged in a long legal endeavor, if you will, over the jury instructions.  I believe they are being corrected at this time.  All the issues were heard but those were heard in the spirit of we were working on instruction [sic].  They were not placed on the record and in Mr. Powell's presence.

With that, Mr. Thebes [defense counsel], I believe yourself and Miss Baronas [defense co-counsel] have made a note page and the Court is going to tell you that we would allow you argument on all those issues.  So even though we are in the middle of preparing we can still be making corrections to instructions.

With that, I know there was a question Miss Baronas as to a foreseeability instruction, and I know it's also a question as far as [a] transferred purpose instruction.

Ms. Baronas: My recollection was I had placed nearly all my arguments on the record. I think the last two arguments that I had placed was a request for special verdict forms as to the specifications for aggravating circumstance, [sic] and at the last minute based on the State's request for foreseeability and transfer purpose instructions we were requesting instruction on [the] lesser included offense of murder under the B section.

{¶ 205} In *State v. Palmer*, 80 Ohio St.3d 543, 687 N.E.2d 685 (1997), syllabus, we held, "The requirement of a complete, full, and unabridged transcript in capital trials does not mean that the trial record must be perfect for purposes of appellate review." Furthermore, *Palmer* stated:

In a number of cases involving death penalty appeals, this court has clearly held that reversal of convictions and sentences on grounds of some unrecorded bench and chambers conferences, off-the-record discussions, or other unrecorded proceedings will not occur in situations where the defendant has failed to demonstrate that (1) a request was made at trial that the conferences be recorded or that objections were made to the failure to record, (2) an effort was made on appeal to comply with App.R. 9 to reconstruct what occurred or to establish its importance, and (3) material prejudice resulted from the failure to record the proceedings at issue.

*Id*. at 554.

{¶ 206} In *State v. Clinkscale*, 122 Ohio St.3d 351, 2009-Ohio-2746, 911 N.E.2d 862, ¶ 15, we declined to extend *Palmer* to encompass the failure to record proceedings relating to the dismissal of a juror in a capital case after the jury had begun its deliberations. *Clinkscale* held that the trial court's failure to make a record of the dismissal of the juror resulted in "material prejudice," because we were unable to determine whether the trial court obtained a waiver or consent of either party before dismissing the juror. *Id.* at ¶ 18. Because of omissions from the record, we were "left to speculate" about the reason for the juror's dismissal, the true severity of the juror's health problem, whether the trial could be continued, or whether any alternative measures may have been taken to address the situation. *Id*. Moreover, we could not determine whether the judge's action affected any of Clinkscale's constitutional rights, because we were "unable to discern whether the juror was, as argued, a lone dissenting juror who wished to be dismissed for this reason." *Id*.

{¶ 207} Unlike in *Clinkscale*, the record in the present case clearly shows the requests and arguments for guilt-phase instructions and other matters that the parties made. The trial court summarized the arguments and requests for instructions that were discussed off the record. Trial counsel also stated that she "had placed nearly all [her] arguments on the record." Under these circumstances, Powell cannot show that he was prejudiced by counsel's failure to object to the unrecorded conference, because defense objections and arguments about the guilt-phase instructions and other matters can be discerned from the record. Accordingly, we reject this claim.

{¶ 208} Powell also argues that his counsel were ineffective by failing to object to unrecorded bench conferences.

{¶ 209} The record shows that there were numerous bench and chambers conferences that were not recorded. Many of these conferences appear to have

involved discussions about scheduling and other administrative matters that were unrelated to substantive or evidentiary matters. As to other unrecorded conferences, Powell cannot show prejudice, because there is no evidence about what happened during these conferences. *See State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 220. "Acts or omissions by trial counsel which cannot be shown to have been prejudicial may not be characterized as ineffective assistance." *State v. Davie*, 80 Ohio St.3d 311, 332, 686 N.E.2d 245 (1997). Thus, we also reject this ineffectiveness claim.

{¶ 210} **3. Failure to hire a substance-abuse expert**. Powell argues that his counsel were ineffective by failing to retain a substance-abuse expert to testify about his history of alcohol and drug abuse. This claim lacks merit.

{¶ 211} Dr. Wayne Graves, a clinical and forensic psychologist, provided expert testimony during mitigation regarding Powell's drug and alcohol abuse. Dr. Graves testified that Powell used alcohol and marijuana on a daily basis and also used crack cocaine. Dr. Graves stated that there was a long history of drug and alcohol abuse in Powell's family. Powell's father gave the defendant marijuana-laced brownies when he was nine and beer when he was ten. Dr. Graves stated that Powell had a very high probability of using drugs and alcohol by growing up in such an environment. Dr. Graves evaluated Powell's behavior on the night of the crimes by stating, "[I]t appears to have occurred while he was drunk or high, in the midst of intensifying conflict with Mary * * * and the others." Thus, the defense presented " 'alternative devices that * * * fulfill[ed] the same functions as the expert assistance sought.' " *Foust*, 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, at ¶ 103, quoting *Jenkins*, 15 Ohio St.3d 164, 473 N.E.2d 264, at paragraph four of the syllabus.

{¶ 212} **4. Presenting damaging testimony from Antonio Garrett.** Powell argues that his counsel should not have allowed Antonio Garrett to testify

as a defense-mitigation witness, because his testimony contradicted other mitigating evidence and revealed information about Powell's criminal past.

{¶ 213} Garrett was the probation officer for Powell in the early 1980s when the defendant was 14 and 16 years old. Garrett did not remember the specific offense that Powell committed that placed him on probation but said that it was a "minor offense." He described Powell's mother as a "very concerned parent," looking out for the best interest of her son. Garrett also testified that Powell's only positive role models were "his mother, his school officials, and [Garrett]."

{¶ 214} During cross-examination, Garrett stated that he did not review Powell's records prior to testifying. Garrett did not recall that Powell had been placed on probation for committing arson. Even after the prosecutor reminded him, Powell did not remember that the offense involved Powell and other boys breaking into a football stadium and starting a fire.

{¶ 215} Powell argues that "properly prepared" counsel would not have called Garrett as a mitigation witness. This claim is speculative. Garrett's testimony softened the image of Powell and suggested that he was a victim of an overwhelmed parent and that more consistent supervision could have prevented this outcome. Thus, Powell fails to demonstrate that counsel were deficient in calling Garrett.

{¶ 216} Powell also claims that his counsel were ineffective by presenting Garrett's testimony that Beatrice, Powell's mother, was doing her best to raise her son. Powell argues that this testimony countered later testimony that portrayed Beatrice as a neglectful mother. Garrett's testimony about Beatrice was limited to his recollection of her parental concern while Powell was on probation. During later testimony, Dr. Graves painted a much broader picture of parental neglect that occurred during Powell's life. Thus, the jury was able to balance Garrett's limited

testimony about Beatrice against more extensive evidence about Powell's background that defense counsel also presented.

{¶ 217} "Generally, counsel's decision whether to call a witness falls within the rubric of trial strategy and will not be second-guessed by a reviewing court." *State v. Treesh*, 90 Ohio St.3d 460, 490, 739 N.E.2d 749. Garrett provided potentially valuable testimony. He reinforced other testimony presented during mitigation that Powell lacked positive role models and had problems in school. He stated that Powell was never offered any treatment for alcohol and substance abuse while on probation. Garrett also remembered Powell as a follower but did not "recall him being the type who would do anything of a malicious nature, not on his own."

{¶ 218} There were advantages, as well as disadvantages, to having Garrett testify. Certainly, it would have been desirable if Garrett had not had to disclose that Powell had set a fire as a juvenile. But the defense received certain benefits by calling Garrett as a witness. Indeed, the defense faced the distinct possibility that Powell's previous conviction would be brought out during the testimony of Dr. Graves. We conclude that counsel's decision to call Garrett as a witness was a reasonable trial strategy and did not violate *Strickland*. *See State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶ 135.

{¶ 219} Even assuming that counsel's performance was deficient, Powell has not demonstrated that the outcome would have been different but for Garrett's testimony. In view of all the evidence, it is improbable that Garrett's testimony regarding Powell's mother's parental concern or his juvenile conviction would have changed the outcome of the sentence. *See id.* at ¶ 139.

{¶ 220} **5. Other allegations of ineffective assistance of counsel**. Powell raises other instances of alleged ineffective assistance of counsel, but even if we assume that counsel were deficient, none prejudiced him. As discussed in other

propositions of law, Powell was not prejudiced by counsel's failure to object to the prosecutor's guilt-phase closing argument (IV) or his penalty-phase closing argument (XVII). Powell was also not prejudiced by counsel's failure to object to penalty-phase instructions (XVIII). We also reject Powell's claim that his counsel were ineffective by failing to object to guilt-phase instructions (VI) because counsel did object to them.

{¶ 221} Based on the foregoing, we overrule proposition XV.

### *Remaining issues*

{¶ 222} *Cumulative error*. In proposition of law XXIII, Powell argues that cumulative errors committed during the trial deprived him of a fair trial and require a reversal of his convictions and death sentence.

{¶ 223} *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus, recognized the doctrine of cumulative error. Under this doctrine, a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal. *Id.* at 196-197. *See also State v Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 132; *Garner*, 74 Ohio St.3d at 64, 656 N.E.2d 623.

{¶ 224} The doctrine of cumulative error is not applicable in the present case. Powell received a fair trial. Moreover, none of the errors committed in this case, when considered either individually or cumulatively, resulted in prejudicial error. As previously discussed in other propositions of law, overwhelming evidence was introduced that established Powell's guilt. Thus, we reject proposition XXIII.

{¶ 225} *Constitutionality*. In proposition of law XVI, Powell challenges the constitutionality of Ohio's death-penalty statutes. These claims can be summarily rejected. *See State v. Carter*, 89 Ohio St.3d 593, 607, 734 N.E.2d 345

(2000); *Jenkins*, 15 Ohio St.3d 164, 473 N.E.2d 264, at paragraph one of the syllabus.

{¶ 226} Powell also contends that Ohio's death-penalty statutes violate international law and treaties to which the United States is a party. These arguments lack merit. *See State v. Issa*, 93 Ohio St.3d 49, 69, 752 N.E.2d 904 (2001); *Bey*, 85 Ohio St.3d at 502, 709 N.E.2d 484.

{¶ 227} *Lethal injection*. In proposition of law XX, Powell challenges the constitutionality of lethal injection. We have previously rejected similar claims. *See State v. Adams*, 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, ¶ 131; *Carter* at 608.

{¶ 228} *Sentencing opinion*. In proposition of law XXV, Powell argues that the trial court failed to properly explain the weight to be afforded the aggravating circumstances in its sentencing opinion. He also argues that the trial court wrongly determined that the aggravating circumstances outweighed the mitigating factors.

{¶ 229} R.C. 2929.03(F) requires the trial court, in imposing a sentence of death, to state in a separate opinion

> its specific findings as to the existence of any of the mitigating factors set forth in division (B) of section 2929.04 of the Revised Code, the existence of any other mitigating factors, the aggravating circumstances the offender was found guilty of committing, and the reasons why the aggravating circumstances * * * were sufficient to outweigh the mitigating factors.

{¶ 230} We have held that in imposing sentence, the assessment of and weight given to mitigating evidence are within the trial court's discretion. *State v.*

*Lott*, 51 Ohio St.3d 160, 171, 555 N.E.2d 293 (1990). The fact that mitigation evidence is admissible "does not automatically mean that it must be given any weight." *State v. Steffen*, 31 Ohio St.3d 111, 509 N.E.2d 383 (1987), paragraph two of the syllabus. "[T]he weight, if any, to assign a given factor is a matter for the discretion of the individual decisionmaker." *State v. Fox*, 69 Ohio St.3d 183, 193, 631 N.E.2d 124 (1994).

{¶ 231} We reject Powell's claim that the trial court failed to adequately explain how it determined that the aggravating circumstances outweighed the mitigating factors. The trial court fully addressed the mitigating evidence that had been presented, including Powell's history, character, and background. The trial court then set forth a detailed explanation for finding that the aggravating circumstances are sufficient to outweigh the mitigating factors:

> Quite simply put, all of the mitigating factors know [sic] to this Court cannot possibly outweigh any single one of the aggravating circumstances in this case. Powell's acts were committed late at night while people were asleep, he purposely set a fire knowing that he would kill or attempt to kill whoever was inside of the home, he knew that there were two or more people inside the home at the time he set the fire because he had been to the home earlier in the night, and he knew that there were children under the age of thirteen inside of the home at the time he set the fire.

{¶ 232} As for Powell's claim that the trial court erroneously concluded that the aggravating circumstances outweighed the mitigating factors beyond a

reasonable doubt, we shall address that argument during our independent sentence evaluation.

{¶ 233} *Appropriateness of death sentence*.  In proposition of law XXIV, Powell argues that the jury wrongly concluded that the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt.  In proposition of law XVI, Powell argues that, in conducting its independent review of the sentence, this court should conclude that the aggravating circumstances do not outweigh the mitigating factors beyond a reasonable doubt.  We shall also address these arguments during our independent sentence evaluation.

## INDEPENDENT SENTENCE EVALUATION

{¶ 234} Having considered Powell's propositions of law, we must now independently review Powell's death sentence for appropriateness and proportionality, as R.C. 2929.05(A) requires.  The separate counts were merged into one count as to each victim before the start of the penalty phase.  The state proceeded with Count 2 (prior calculation and design) as to Mary McCollum, Count 7 (prior calculation and design) as to Rose McCollum (murder during aggravated arson), Count 9 as to Sanaa' Thomas (murder during another aggravated murder), and Count 10 as to Jamal McCollum-Myers (purposely causing the death of a child under 13).

{¶ 235} *Aggravating circumstances*.  The evidence at trial established beyond a reasonable doubt that Powell murdered Mary McCollum as part of a course of conduct involving the purposeful killing of two or more people, R.C. 2929.04(A)(5), and while committing aggravated arson, R.C. 2929.04(A)(7).  The evidence also established beyond a reasonable doubt that Powell murdered Rosemary McCollum as part of a course of conduct, R.C. 2929.04(A)(5), and while committing aggravated arson, R.C. 2929.04(A)(7).  In addition, the evidence established beyond a reasonable doubt that Powell murdered Jamal

McCollum-Myers as part of a course of conduct, R.C. 2929.04(A)(5), while committing aggravated arson, R.C. 2929.04(A)(7), and while purposefully killing a child under the age of 13, R.C. 2929.04(A)(9). The evidence established beyond a reasonable doubt that Powell murdered Sanaa' Thomas as part of a course of conduct, R.C. 2929.04(A)(5), while committing aggravating arson, R.C. 2929.04(A)(7), and while purposefully killing a child under the age of 13, R.C. 2929.04(A)(9).

{¶ 236} *Mitigating evidence*. Against each of these aggravating circumstances, we are called upon to weigh the mitigating factors contained in R.C. 2929.04(B). Powell presented eight mitigating witnesses. The defense also presented various photographs showing Powell and other family members.

{¶ 237} Antonio Garrett was Powell's probation officer in the early 1980s when Powell was between 14 and 16 years old. Garrett did not remember the offense that Powell had committed, but during cross-examination, it was disclosed that it was arson.

{¶ 238} Garrett described Powell as being "pretty mild mannered, laid back, very responsive to supervision." Garrett recalled that Powell had "some difficulties with academics, some minor difficulties with attendance, and some difficulties keeping up with * * * others who are students at his grade level."

{¶ 239} Garrett stated that Powell's only positive role models during this time were "his mother, his school officials, and [Garrett]." Powell's mother was a "[v]ery concerned parent who was looking out for the best interest of her child." Garrett did not recall any involvement with Powell's father.

{¶ 240} Powell completed his probationary status in a satisfactory manner. Garrett did not believe that Powell was "the type who would do anything of a malicious nature, not on his own." Although he did not recall the offense, Garrett

64

testified that Powell committed another offense after completing probation and was sent to the Department of Youth Services.

{¶ 241} Isaac Powell IV ("Isaac IV"), the defendant's father, testified that he grew up in an alcoholic family. Isaac IV started drinking when he was nine or ten years old. He became a heavy drinker and "used to get [in] quite a bit of trouble messing with alcohol." Isaac IV also "tried just about anything they put out to make your head numb," including "[m]arijuana, opium, acid, cocaine, [and] heroin." Isaac "sometimes" took his children with him when he went drinking.

{¶ 242} Isaac IV met Beatrice, Powell's mother, in 1964, and they married after having two children: Wayne and Charles. Isaac V was born during the marriage. Isaac IV also has another son, Darrell Fletcher. Isaac IV described the defendant as "just a regular kid" when he was a child. Isaac IV described Beatrice as a "good mother" who took care of the kids.

{¶ 243} Isaac IV and Beatrice divorced when Powell was eight years old. Isaac IV testified that he and Beatrice had arguments and sometimes physically fought. Their fights were usually about Isaac's absence from home. On one occasion, Isaac IV slapped Beatrice during a heated argument, and she stabbed him.

{¶ 244} Isaac IV was in prison from 1981 to 2001 for murdering Beatrice's nephew. Isaac IV testified that he did not remember anything about the incident but that drugs and alcohol had been a factor. Isaac IV no longer drinks, smokes, or uses drugs. Isaac IV and Powell have worked together since Isaac was released from prison. Isaac stated, "We did handyman work, lawn service. I even got him in with me with the janitorial. About anything to make a buck that was honest."

{¶ 245} Beatrice Powell Lucas testified that she had met Isaac IV when they resided in the same apartment building. They started to live together and

began having children. Beatrice's family did not like the way she was living, because her family was very religious. Beatrice had already had a son, Eric Brown, who was six and one-half years older than Powell.

{¶ 246} Beatrice and Isaac were married after Powell and his brother, Charles, were born. Beatrice developed an infection and was hospitalized during her pregnancy with the defendant. When she was seven months pregnant, Beatrice visited her sister and saw Isaac "coming down a lady's step with his shirt off with his clothes off." Beatrice was so depressed that she went home, drank heavily, and thought about suicide.

{¶ 247} Beatrice testified that Powell was "pretty good as a baby." Powell was smart and loved to read, but always seemed to have trouble in school, and he was held back in third grade. Beatrice testified that Powell developed a "complex" because Charles did well in school.

{¶ 248} Beatrice and Isaac had marital problems, because of Isaac IV's alcohol and drug use and because he was "running the streets." Beatrice and Isaac IV argued and had physical fights. Beatrice testified, "Once he slapped me and I guess I cussed so long and so loud he left and he stayed gone about two weeks." On another occasion, she said, "He hit me with his fist in the nose coming down the hall so I cut him" with a scalpel. On yet another occasion, Isaac held a gun to Beatrice's head for an entire evening.

{¶ 249} Beatrice testified that "[e]verything just went haywire" after Isaac IV murdered her nephew. She stated, "When Isaac got into trouble about killing my nephew, * * * the cousins all kind of picked on my kids." Beatrice continued working after Isaac went to prison. Because she could not afford a babysitter, her children "cared for themselves." Powell was 12 years old at the time.

{¶ 250} Powell got into trouble as a juvenile and spent time in juvenile detention. Beatrice stated that Powell was a different person when he returned

home. She stated, "He talked different. His voice had changed. He could get pretty angry. And he was missing some teeth." Powell said that he lost the teeth in a fight when somebody tried to sexually assault him.

{¶ 251} Powell was married and divorced before he became involved with Mary. Powell has sired three children by two women.

{¶ 252} Charles Powell, one of the defendant's younger brothers, spent a lot of time with Powell when they were growing up. Charles stated that Powell was "rather quiet as a kid" and the "timid and shy type." Powell liked to work on cars. Charles stated that their father had a "[v]ery big influence" on his sons. Charles idolized his father and thought he was the "[s]martest guy [Charles] ever met." Isaac IV used a belt to discipline Charles and his brothers. Charles remembers watching his father get drunk. Charles also saw his father with female friends and knew that he obtained money from them. Charles testified that "it was a crushing blow" when their father went to prison.

{¶ 253} According to Charles, Powell was not the same person when he returned home from the juvenile detention facility. Charles testified that Powell's temper was worse, and he was "more ready to fight after he came back than he was before he went."

{¶ 254} Powell has done handyman work, landscaping, and roofing as an adult. Charles owns a painting company, where Powell occasionally worked as a painter. Charles described Powell as a good worker who shows up on time.

{¶ 255} Charles observed Powell and Jamal interact. Charles stated that "they had a serious bond. Jamal actually called him daddy." Powell also has a good relationship with Markisha and his other children.

{¶ 256} Isaac Powell V (Isaac V") the defendant's youngest brother, is five years younger than Powell. His mother would not allow Isaac V to spend

much time with his brothers, because of the age difference. Isaac V expressed his feelings for Powell by saying, "I love him to death. He is my brother."

{¶ 257} Priscilla Fletcher, the wife of Darrell Fletcher, works as a sheriff's deputy and is acquainted with all of Powell's brothers. Priscilla stated, "They all seem to have a good relationship with one another." Priscilla also testified that Powell has a good relationship with Markisha and his grandchildren.

{¶ 258} Powell often sought advice from Darrell about different problems, because Darrell was a little older. Priscilla stated, "[W]henever [Powell] got upset or he needed somebody to talk to * * * him and [Darrell] would sit and talk for hours and when they get done talking he will have a different outlook on whatever was bothering him."

{¶ 259} Priscilla testified that Powell is a good handyman: "You say something is wrong with your car * * * and he can tell you exactly what is wrong with it and fix it." Powell has worked on her car and his father's truck.

{¶ 260} Darrell Fletcher, the defendant's half-brother, is one year older than Powell. Darrell testified that he helped his brothers after their father went to prison. Powell would sometimes seek advice from Darrell and "talk over things going on in his life." Darrell has remained close with Powell through the years.

{¶ 261} Dr. Wayne Graves, the clinical and forensic psychologist, evaluated and conducted psychological testing of Powell. Dr. Graves also interviewed Powell's parents and reviewed Powell's records. Dr. Graves stated that testing showed that Powell has "probably average intellectual capability. He is right in the average range. * * * His non-verbal skills are a little better than * * * his verbal. It's evident he didn't get a great deal out of school when he was there." Powell dropped out of school in the tenth grade. But he finished his GED in prison.

{¶ 262} Results from the Minnesota Multiphasic Personality Inventory II suggested that Powell is under stress. These results also showed that Powell is "probably anxious, depressed and has been quite a lot of his life." Testing also showed that Powell is "kind of dependent, moody, and impulsive, prone toward getting angry. Needy in relationships." The Millon Clinical Multiaxial Inventory showed longer-term character issues. Dr. Graves stated that drug and alcohol issues "are very present." These test results also showed Powell "[w]anting someone to approve of him and the impulsiveness and some brittleness in the way he responds to others."

{¶ 263} Powell reported using alcohol and marijuana on a daily basis. He also acknowledged that he used crack and powdered cocaine and tried several other drugs in the past. Dr. Graves testified that Powell had a long family history of drug and alcohol abuse. Powell's father was an active alcoholic and drug abuser through most of Powell's childhood. Powell's paternal grandparents were also alcohol-dependent and drug abusers. Dr. Graves testified, "His father fed him marijuana laced brownies at age nine. Was giving him beer by ten. * * * So he was taught how to do this."

{¶ 264} Powell's parents lived together for about ten years. Powell was born during this time. His parents later got married but divorced when Powell was a child. Dr. Graves stated that Powell's mother "was and still is angry at Wayne's father who * * * she called * * * a whore. Because he was always out on the streets and always with somebody else and always cheating on her and not able to sustain a relationship."

{¶ 265} Powell's mother was angry and depressed that she was pregnant with Powell. Dr. Graves stated that "[a]t one point she thought of trying to kill herself in order to get out of the situation." Beatrice felt that she was "stuck" with Powell and viewed him as her "trouble child." "She acknowledged that he * * *

made her mad as hell * * *. She acknowledged she would hit him and punish him with belts and straps." Dr. Graves stated that Powell was "basically rejected by mom and she was kind of detached and pulled away most of the time."

{¶ 266} Dr. Graves stated that there was a lack of trust and communication in Powell's family. There was also a history of violence. Isaac IV physically abused Beatrice on occasion. In discussing Powell's upbringing, Dr. Graves stated:

Wayne grew up in an environment in which * * * he was being exposed to people stealing things, cheating. His father had him keeping secrets from mom almost from the beginning. He was in trouble in school. He was a fat little kid who got picked on because he was overweight and has a very poor body image still.

{¶ 267} Powell's family lived in a poor neighborhood. According to Dr. Graves, Powell had "[a]ccess to drugs and alcohol" and very few models of stable relationships. The community had more drugs, guns, and violence than most communities.

{¶ 268} Dr. Graves reported that Powell had a history of misconduct. He had been involved in petty theft as a child. Powell was charged with arson when he was nine or ten when he and some older peers broke into a stadium and set a fire. Powell also got into trouble in school. He got into a physical fight with a vice principal when he was 14. Powell also hurt a girl when he tried to steal something from her coat. Powell was in juvenile court two or three times, and he was sent to a detention center for six months when he was 16. Powell reported that he was physically assaulted on two occasions while there. Powell claimed that one of these incidents was a sexual assault, though records from the

Department of Youth Services do not confirm that Powell had been sexually assaulted.

{¶ 269} Dr. Graves also testified that Powell has a lengthy criminal history as an adult:

[H]e has had aggravate[ed] trafficking in 1993 of drugs, felonious assault in '97 and 2006. He has been charged with domestic violence on two occasion[s] in '95, '96, and 2003.

He has had other assault charges that are on criminal dockets in '87, '88, '89. He spent two periods in prison, once for the trafficking and once in the felonious assault in '97. He spent five years in prison at that time.

{¶ 270} Dr. Graves stated that Powell's adjustment to prison life was "good with some isolated incidents." Once during incarceration, Powell hit a cellmate over the head with a chair in response to the cellmate's talk about sexually assaulting him. Powell spent six months in solitary confinement for that incident. He also had a couple of minor rule infractions. Powell has had two incidents while awaiting trial for the murder offenses. Powell got into a verbal confrontation with deputies, and he broke his hand after fighting with another inmate about the lights being on or off.

{¶ 271} Powell has significant chronic health problems, including diabetes, high blood pressure, high cholesterol, a heart condition, and diverticulitis.

{¶ 272} Dr. Graves reported that Powell has never had a successful male-female relationship. He sired three children by two women. He was married

once, but he learned that the two children his wife bore during their marriage were not his. Powell had a terrible on-and-off relationship with Mary McCollum.

**{¶ 273}** Powell has not been very involved in his children's lives. Powell did not pay child support or spend any substantial time with them. He did not have a relationship with Markisha until he left prison. Dr. Graves described Powell's relationship with Jamal as "kind of [a] second chance at fatherhood." Powell was frequently babysitting and taking care of Jamal. Powell was also proud that Jamal listened and responded to him.

**{¶ 274}** Powell does not take responsibility for his crimes. Dr. Graves believes that this is "because [of] the emotional impact that it has on him and also because * * * it appears to have occurred while he was drunk or high in the midst of intensifying conflict with Mary, the victim, and the others." Even so, Powell is upset that people died in the fire, particularly Jamal and Sanaa'.

### Sentence evaluation

**{¶ 275}** We find nothing mitigating in the nature and circumstances of the offenses. Powell set fire to a home in the middle of the night. Eight people were inside the home at the time of the fire, including five children and a disabled woman. Powell knew that people were inside the home when he started the fire, because he had been there earlier in the evening. Four people, including two children, died during the fire. These facts establish a senseless, horrific crime that lacks any mitigating features.

**{¶ 276}** Although Powell's character offers nothing in mitigation, we give some weight to Powell's history and background. Powell grew up in a dysfunctional family. His parents fought and argued frequently. Powell was also raised in a family with a long history of drug and alcohol abuse. His father provided drugs and alcohol to him while he was a child. Powell's father also had many girlfriends, was away from home on a regular basis, and spent 20 years in

prison for murder. In addition, Powell was rejected by his mother, who resented Powell's father and was unhappy that Powell had been born. Thus, many of Powell's problems in coping with and adapting to life can be traced to his upbringing. Nevertheless, such evidence is not entitled to decisive weight. *See, e.g., State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 265 (decisive weight seldom given to defendants with unstable childhoods).

{¶ 277} The statutory mitigating factors under R.C. 2929.04 include (B)(1) (victim inducement), (B)(2) (duress, coercion, or strong provocation), (B)(3) (mental disease or defect), (B)(4) (youth of the offender), (B)(5) (lack of significant criminal record), (B)(6) (accomplice only), and (B)(7) (any other relevant factors). Review of the evidence shows that none of these statutory factors are applicable except (B)(7).

{¶ 278} We give some weight to Powell's drug and alcohol problems as an R.C. 2929.04(B)(7) mitigating factor. Powell's drug and alcohol use undoubtedly affected his judgment and may have played a role in the murders. There is no testimony that drugs and alcohol significantly reduced his ability to control his actions on the night of the murders. *See State v. Hartman*, 93 Ohio St.3d 274, 306, 754 N.E.2d 1150 (2001).

{¶ 279} We also give weight as a (B)(7) mitigating factor to testimony that Powell shares love and support with family members. We also give weight as a (B)(7) factor to evidence that when Powell worked, he was a good and dependable worker. *See State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 327.

{¶ 280} Powell argues that the court should also consider testimony that he has previously adjusted well to prison life. Evidence showing a defendant's ability to adjust to prison life is a mitigating factor that can be assigned weight. *See State v. Madrigal*, 87 Ohio St.3d 378, 397, 721 N.E.2d 52 (2000). Dr. Graves

testified that Powell's "adjustment was good with some isolated incidents" during the five and one half years he spent in prison. Yet Powell spent six months in solitary confinement after hitting a cellmate over the head with a chair. He was also involved in a fight with another cellmate while in jail and awaiting trial for the current offenses. Thus, we assign minimal weight to this evidence. Powell also argues that the nature and circumstances of the offense have mitigating value. Powell points out that he had a longstanding relationship with Mary McCollum that was often marked by conflict and separation. Accordingly, Powell argues that his actions were a crime of passion. Powell's explanation provides no mitigating reason for murdering her and three other people when he burned down Mary's house. Thus, we reject this argument.

{¶ 281} Additionally, Powell argues that the aggravating circumstances in this case were not as serious as they could have been. He states that this case did not involve the assassination of the president, the killing of a law-enforcement officer, or a contract killing. We summarily reject this argument.

{¶ 282} Based on our independent weighing of the evidence, we conclude that the aggravating circumstances as to each count clearly outweigh all mitigating factors beyond a reasonable doubt. As to Count 2, Powell's murder of Mary occurred by setting her house on fire and involved the murder of two or more people. These constitute grave circumstances. As to Count 7, the two aggravating circumstances attached to Rosemary's murder involve a similar degree of seriousness. As to Count 9, the three aggravating circumstances attached to the murder of Sanaa' are extremely serious. In particular, the R.C. 2929.04(A)(9) child-murder specification is entitled to great weight because it involved the murder of a young and vulnerable victim. As to Count 10, the three aggravating circumstances attached to Jamal's murder involve the same degree of seriousness. In contrast, we find that as to each of these counts, Powell's

mitigating evidence has little significance. Therefore, we conclude that the death sentence in this case is appropriate.

{¶ 283} Finally, we find that the death sentence imposed in this case is both appropriate and proportionate when compared to death sentences imposed in other cases. As for all four murder counts, we have previously upheld the death sentences for a course of conduct under R.C. 2929.04(A)(5). *See Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, at ¶ 329; *Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, at ¶ 284; and *Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, at ¶ 182.

{¶ 284} Additionally, we have upheld the death penalty for other child murders under R.C. 2929.04(A)(9). *See Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, at ¶ 206; *State v. Fitzpatrick*, 102 Ohio St.3d 321, 2004-Ohio-3167, 810 N.E.2d 927, ¶ 119; and *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 196. We have also upheld the death penalty for aggravated murder during an aggravated arson under R.C. 2929.04(A)(7). *See Foust*, 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, at ¶ 204; *State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, ¶ 99; and *State v. Wilson*, 74 Ohio St.3d 381, 401, 659 N.E.2d 292 (1996).

## Conclusion

{¶ 285} We affirm Powell's convictions and sentences of death.

Judgment affirmed.

O'CONNOR, C.J., and LUNDBERG STRATTON, O'DONNELL, LANZINGER, CUPP, and MCGEE BROWN, JJ., concur.

_____

Julia R. Bates, Lucas County Prosecuting Attorney, and David F. Cooper and J. Christopher Anderson, Assistant Prosecuting Attorneys, for appellee.

Spiros P. Cocoves and Gary W. Crim, for appellant.

————————————